**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| LIGHTHOUSE FELLOWSHIP CHURCH, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. <u>2:20-cv-204</u> |
| ) | |
| RALPH NORTHAM, in his ) | |
| official capacity as Governor of the ) | |
| Commonwealth of Virginia, ) | |
| ) | |
| Defendant. ) | |

## PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH INCORPORATED MEMORANUM OF LAW

Pursuant to Fed. R. Civ. P. 65 and L. Civ. R. 7, Plaintiff, LIGHTHOUSE FELLOWSHIP CHURCH ("Lighthouse" or the "Church"), moves this Court for a Temporary Restraining Order (TRO) and Preliminary Injunction against Defendant, RALPH NORTHAM, in his official capacity as Governor of the Commonwealth of Virginia ("Governor Northam" or the "Commonwealth"), as set forth below and in Lighthouse's contemporaneously filed Verified Complaint.

## URGENICES JUSTIFIYING TEMPORARY RESTRAINING ORDER

In its Prayer for Relief in its Verified Complaint, Lighthouse seeks a TRO restraining and enjoining Governor Northam and his designees from unconstitutionally enforcing and applying the various COVID-19 Executive Orders and other enforcement directives (collectively "GATHERING ORDERS") purporting to prohibit Lighthouse, on pain of criminal sanctions, from gathering for worship services at Lighthouse, regardless of whether Lighthouse meets or exceeds the social distancing, enhanced sanitization, and hygiene guidelines pursuant to which the Commonwealth disparately and discriminatorily allows so-called "essential" commercial and non-religious entities (*e.g.*, beer, wine, and liquor stores, warehouse clubs, 'big box' and 'supercenter'

stores) to accommodate gatherings, crowds, and masses of more than ten (10) individuals—indeed, with no numerical limit—without scrutiny or threat of criminal sanctions. As shown in the Verified Complaint, the GATHERING ORDERS have been interpreted, applied, and enforced, including against the Pastor of Lighthouse, such that police officers in the Commonwealth of Virginia have visited Virginia churches, such as Lighthouse, threatened to impose, and in the case of Lighthouse, actually imposed, criminal sanctions against religious gatherings that include more than ten individuals, regardless of whether appropriate and government-recommended social distancing, enhanced sanitization, and personal hygiene recommendations are practiced.

At around the same time as Governor Northam's Executive Orders surrounding COVID-19 were being used to impose criminal sanctions on Lighthouse's pastor, officials in other jurisdictions had similarly threatened to impose criminal sanctions on other religious gatherings. In Louisville, Kentucky, for example, the government threatened to use police to impose criminal sanctions on those individuals found in violation of similar COVID-19 orders and threatened to impose various sanctions on individuals found in violation of such orders. The United States District Court for the Western District of Kentucky found that the mere threat of such criminal sanction warranted a TRO. *See On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. Apr. 11, 2020) [hereinafter *On Fire*]. The *On Fire* TRO enjoined the Mayor of Louisville from "**enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on drive-in church services at On Fire**." *Id.* at *1 (emphasis added).

Additionally, the Governor of Kansas had imposed a virtually identical restriction on religious gatherings in Kansas, stating that "gatherings" of more than 10 individuals are prohibited, including religious gatherings. On April 18, 2020, the United States District for the District of

Kansas issued a TRO enjoining Kansas officials from enforcing its discriminatory prohibition on religious gatherings and required the government to treat "religious" worship services the same as other similar gatherings that are permitted. *See First Baptist Church. v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, *6–7 (D. Kan. Apr. 18, 2020) [hereinafter *First Baptist*]. The *First Baptist* TRO specifically stated that the government's disparate treatment of religious gatherings was a violation of the Free Exercise Clause because it showed that "**religious activities were specifically targeted for more onerous restrictions than comparable secular activities**," and that the churches had shown irreparable harm because they would "be prevented from gathering for worship at their churches" during the pendency of the executive order. *Id.* at *7–8 (emphasis added). In discussing the Kansas orders—which imposed a 10-person limit on in-person gatherings just as the Governor Northam orders here—the court said that specifically singling out religious gatherings for disparate treatment while permitting other non-religious activities "show[s] that these executive orders expressly target religious gatherings on a broad scale and are, therefore, not facially neutral," *First Baptist*, 2020 WL 1910021, at *7, and—much like here—"churches and religious activities appear to have been singled out among essential functions for stricter treatment. **It appears to be the only essential function whose core purpose—association for the purpose of worship—had been basically eliminated**." *Id.* (emphasis added). Thus, the court found that Kansas should be enjoined from enforcing their disparate terms against churches.

Yet, what the government in Louisville only threatened to do, Governor Northam and police officers in the Commonwealth of Virginia actually did to Lighthouse on April 5, 2020. Pursuant to Governor Northam's Executive Order prohibiting the in-person gathering of more than 10 individuals, the Town of Chincoteague Police Department actually issued a criminal citation and summons to Pastor Kevin Wilson of Lighthouse ("Pastor Wilson") for the sole act of holding

a church service in the Commonwealth of Virginia. In addition to that actually imposed criminal sanction, officials in the Commonwealth threatened to impose similar criminal sanctions on Lighthouse, its pastor, and each and every member and/or attendee who dared visit the Lighthouse Fellowship Church's service on Easter Sunday or any other worship service held while Governor Northam's orders are in effect. Additionally, the Virginia State Police—acting under the direction of Governor Northam's orders—have publicly declared that they would enforce the Governor's orders and have threatened to impose criminal sanctions on those found in violation of them. **Absent emergency relief from this Court, Lighthouse, its pastor, and all members and/or attendees will suffer immediate and irreparable injury from the threat of criminal prosecution for the mere act of engaging in the free exercise of religion and going to church.** A temporary restraining should issue.

Lighthouse prays unto this Court to issue a TRO restraining and enjoining Governor Northam from similarly **enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with any prohibition on religious gatherings** of more than 10 individuals, as against Lighthouse. Lighthouse does not seek, at this emergent stage of the proceedings, to undermine the entirety of Governor Northam's efforts to prevent the spread of COVID-19 in the Commonwealth. **Lighthouse merely seeks to be free from the unconstitutional application of the GATHERING ORDERS in such a way that they are threatened with criminal sanctions and suffer criminal penalties for simply going to church.** Absent emergency relief from this Court, Governor Northam and the State Police will continue to threaten Lighthouse with criminal sanctions and other penalties, **including this Sunday**, by targeting Lighthouse's religious gatherings for discriminatory treatment.

## MEMORANDUM OF LAW IN SUPPORT

To obtain a TRO or PI, Lighthouse must demonstrate it has a strong likelihood of success on the merits, that it will suffer irreparable injury absent the order, that the balance of the equities favors the order, and that the public interest is served by the Court's issuing the order. *See MicroStrategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001); *Moore v. Kempthorne*, 464 F. Supp. 2d 519, 525 (E.D. Va. 2006) ("The standard for granting either a TRO or preliminary injunction is the same."). Lighthouse easily satisfies each of these elements factually and legally. (Lighthouse hereby incorporates by reference the allegations of its Verified Complaint, filed contemporaneously herewith, as its statement of facts in support of this motion.)

I.      **LIGHTHOUSE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIM THAT THE COMMONWEALTH'S APPLICATION OF THE GATHERING ORDDERS IS UNCONSTITUTIONAL AND SHOULD BE RESTRAINED.**

A.      **The Commonwealth's Unconstitutional Application of the GATHERING ORDERS Violates Lighthouse's First Amendment Rights to Free Exercise of Religion and Should Be Restrained.**

Though the Commonwealth might not view church attendance as fundamental to the religious beliefs of Lighthouse, its opinion is irrelevant to the protections afforded to Lighthouse's sincerely held religious beliefs. Lighthouse's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merits First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Security Div.*, 450 U.S. 707, 714 (1981). Indeed, "[a]t a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or **regulates or prohibits conduct because it is undertaken for religious reasons**." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added). "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543. As the Western District

5

of Kentucky just noted, prohibiting Lighthouse from hosting, and its members from attending, religious services where other non-religious gatherings are permitted under similar circumstances "**violat[es] the Free Exercise Clause beyond all question**." *On Fire*, 2020 WL 1820249, at *6 (emphasis added). Even in a time of crisis or disease, *see Jacobson v. Massachusetts*, 197 U.S. 11 (1905), the First Amendment does not evaporate. Indeed, "even under *Jacobson*, constitutional rights still exist. Among them is the freedom to worship as we choose." *On Fire*, 2020 WL 1820249, at *8; *see also Terminiello v. City of Chicago*, 337 U.S. 1, 27, 31, 38 (1949).

   1. **Burdens on sincerely held religious beliefs are subject to strict scrutiny if neither neutral nor generally applicable.**

  As a matter of black letter law, "a law that is neutral and of general applicability need not be justified by a compelling government interest even if the law has the incidental effect of burdening a particular religious practice." *Lukumi*, 508 U.S. at 531. But, as here, "[a] law failing these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest," *id.* at 532, and "will survive strict scrutiny only in rare cases." *Id.* at 546. The GATHERING ORDERS are neither neutral nor generally applicable and therefore must satisfy strict scrutiny.

   2. **The Commonwealth's application of the GATHERING ORDERS is neither neutral nor generally applicable.**

    a. **The GATHERING ORDERS are not neutral.**

  "Although a law targeting religious beliefs as such is never permissible . . . if the object of the law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral." *Lukumi*, 508 U.S. at 533. To determine neutrality, courts look to the text of the law "for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* But, "[f]acial neutrality is not determinative. The Free Exercise Clause extends beyond facial discrimination [and] forbids subtle departures from neutrality." *Id.* at 534. This is so because, as here, "[o]fficial

action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with facial neutrality." *Id.* For the First Amendment prohibits hostility that is "masked, as well as overt." *Id.* The GATHERING ORDERS are not facially neutral, and even if they were, they represent subtle departures from neutrality by treating Lighthouse's religious gatherings of more than 10 individuals differently than similar non-religious gatherings.

The GATHERING ORDERS fail even cursory facial examination. They expressly target "religious" gatherings for disparate treatment. (V.Compl. ¶ 31, EX. C.) Yet, in the very same text of the GATHERING ORDERS, businesses such as liquor stores, warehouse clubs, supercenter stores, and even "non-essential" retail stores are exempted from the broad prohibitions. (V.Compl. ¶¶ 27, 32, EX. C.) When the government "has targeted religious worship" for disparate treatment—such as attending religious worship services—while "not prohibit[ing] parking in parking lots more broadly—including, again, the parking lots of liquor stores," it simply fails the test of neutrality. *On Fire*, 2020 WL 1820249, at *6. Furthermore, here, as in *First Baptist*, the "orders begin with a broad prohibition against mass gatherings [but] proceed to carve out broad exemptions for a host of secular activities, **many of which bear similarities to the sort of personal contact that will occur during in-person religious services**." 2020 WL 1910021, at *5 (emphasis added). Under such a system of carve-outs for everyone but religious assembly, the GATHERING ORDERS are simply not neutral. *Id.*

Governor Northam expressly targets churches and churchgoers, threatening criminal prosecution, and sending State Police to people attending a religious worship service. At the same time, no similar action is directed towards people in liquor stores, in Walmart, or even in "non-essential" retail business. The GATHERING ORDERS are not neutral.

**b.      The GATHERING ORDERS are not generally applicable.**

In determining general applicability, the courts focus on disparate treatment of similar conduct. *See Lukumi*, 508 U.S. at 542. "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice." *Id.* The textbook operation of a law that is not generally applicable is one where "inequality results" from the government's "decid[ing] that the governmental interests it seeks to advance are worthy of being pursued **only against conduct with religious motivation**." *Id.* at 543 (emphasis added). In *Lukumi*, the Supreme Court held that a law "fall[s] well below the minimum standard necessary to protect First Amendment rights" when the government "**fail[s] to prohibit nonreligious conduct that endangers these interests in a similar or greater degree**" than the prohibited religious conduct. *Id.* (emphasis added).

This is precisely the effect of the GATHERING ORDERS. First, they purport to prohibit "all gatherings," but define "all gatherings" to exclude large crowds and masses of people gathered at numerous businesses and other non-religious entities. (V.Compl. ¶¶ 27–32, EXS. B, C.) Their text makes it plain that "religious" gatherings of more than 10 individuals are prohibited, but large numbers of people may gather at liquor, warehouse, and supercenter stores, as but a few examples. (*Id.*) Moreover, non-retail businesses may accommodate unlimited employees and customers during all hours if they observe distancing and hygiene recommendations. (*Id.*) Furthermore, unlimited non-religious **gatherings at "non-essential" retail businesses are permitted** for employees and non-customer persons if distancing and hygiene guidelines are. (*Id.*) But "religious" gatherings of 11 people are still prohibited, no matter how large the facility or how long the gathering lasts, even if social distancing, enhanced sanitizing, and personal hygiene guidelines are followed religiously. If large gatherings at liquor, warehouse, and supercenter stores, non-retail business, and even "non-essential" retail businesses are not prohibited—and

8

distancing and hygiene practices are only required "to the extent possible"—even though endangering citizens (or not) to an equal degree, then it is obvious "religious" gatherings have been targeted for discriminatory treatment. Such a blatant discriminatory application of the GATHERING ORDERS "falls well below the minimum standard" the First Amendment demands. *Lukumi*, 508 U.S. at 543; *see also On Fire Christian Ctr.*, 2020 WL 1820249, at *6 (holding that government regulation is not generally applicable when it targets religious gatherings with "orders and threats" but does not apply the same orders and threats to similar non-religious conduct). The GATHERING ORDERS are not generally applicable.

    **B.**    **The Commonwealth's Unconstitutional Application of the GATHERING ORDERS Violates Lighthouse's First Amendment Rights to Be Free from Government Hostility and Disparate Treatment Under the Establishment Clause.**

    "**If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith threrein**." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added). Where, as here, Lighthouse seeks to be free from disparate treatment by the Commonwealth, the very core of the Establishment Clause is at issue. "An attack founded on disparate treatment of "religious" claims invokes what is perhaps the central purpose of the Establishment Clause—**the purpose of ensuring governmental neutrality in matters of religion**." *Gillette v. United States*, 401 U.S. 437, 449 (1971) (emphasis added). Indeed, the Establishment Clause "affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility towards any." *Lynch v. Donnelly*, 465 U.S. 668, 673 (1984). That mandate of preventing hostility towards religions is equally present in times of exigent circumstances, such as COVID-19. For, as "[a]n instrument of

social peace, **the Establishment Clause does not become less so when social rancor runs exceptionally high**." *Lund v. Rowan Cnty.*, 863 F.3d 268, 275 (4th Cir. 2017) (emphasis added).

But, the principle of neutrality requires that this Court analyze whether the government's motive in applying disparate treatment to religious gatherings, as opposed to non-religious gatherings of like kind, is not merely a pretext or a sham. *See, e.g.*, *McCreary Cnty. v. ACLU of Ky.*, 545 U.S. 844, 864 (2005) (holding that the government's motive for its actions "has to be genuine, not a sham"); *Wood v. Long*, 915 F.2d 308, 315 (4th Cir. 2019) (same). In determining whether the government's motive represents a sham, courts often look to the progression of the government's actions. *See McCreary*, 545 U.S. at 866 (declining to accept the government's proposition that "the last in a series of government actions" is determinative for whether its actions offend the Establishment Clause). Here, the progression of the Commonwealth's actions demonstrate that religious gatherings were "targeted for stricter treatment due to the nature of the activity involved, rather than because such gatherings pose unique health risks that mass gatherings at commercial and other facilities do not," and "the disparity has been imposed without any apparent explanation for the differing treatment of religious gatherings." *First Baptist*, 2020 WL 1910021, at *7.

Indeed, the Commonwealth started with the general position that "all public and private gatherings of more than 10 individuals" were prohibited. (V.Compl. ¶ 26, EX. B.) But, in the next breath, opened a broad category of exemptions for "beer, wine, and liquor stores," "department stores," and other retailers deemed "essential." (V.Compl. ¶ 27.) On March 30th, the Commonwealth clarified its initial gathering prohibition, making it explicitly clear that "religious" gatherings were not "essential" and were not permitted to continue, while as similarly situated "essential" and "non-essential" businesses could continue accommodating crowds and masses.

(V.Compl. ¶¶ 31–32, EX. C.) Then, on April 1, the Commonwealth made it abundantly clear that it would enforce Governor Northam's GATHERING ORDERS against churches and religious gatherings by having the State Police release enforcement guidelines threatening criminal penalties and sanctions for violation of the GATHERING ORDERS. (V.Compl. ¶ 34, EX. D.) If the threat of enforcement were not alone sufficient, Governor Northam's GATHERING ORDERS have actually been enforced against Lighthouse through criminally citing its pastor for going to church. (V.Compl. ¶ 48, EX. F.) That criminal enforcement took place on April 5, a mere six days after Governor Northam imposed his draconian prohibitions on religious gatherings.

Perhaps sensing that arresting pastors, imposing criminal sanctions on them, and hailing them into judicial tribunals for the act of hosting worship was problematic, Governor Northam had his office issue certain guidance to the "Faith Community." (V. Compl. ¶¶ 36–38, EX. E.) That document, issued two days after Lighthouse's Pastor had been issued a criminal citation and summons, purported to lessen the burden on certain religious gatherings. (V.Compl. EX. E.) That document reiterates that churches may only have gatherings (*i.e.*, worship services) if they abide by the Governor's 10-person limit, and then "benevolently" informs Lighthouse that it may conduct worship services approved by the government—such as "drive-in," "drive-thru," or "parking lot" worship—so long as no one actually assembles together in person. (*Id.*)

The progression of the Commonwealth's actions was a sham at the start and remains unconstitutional even after its "benevolent" instructions for "proper" worship during COVID-19. Its purpose in treating religious gatherings differently from the start was a sham because there is no evidence that religious gatherings "pose unique health risks that mass gatherings at commercial and other facilities do not," *First Baptist*, 2020 WL 1910021, at *7, or "because the risks at religious gatherings uniquely cannot be adequately mitigated with safety protocols" such as those

at liquor stores or other "essential" stores that may continue to operate without numerical limitation or scrutiny. *Id.* Thus, treating Lighthouse and other religious gatherings differently was a sham from the start and remains constitutionally infirm even now. **Indeed, the government does not have the authority to, with the stroke of a pen, declare churches and attendance at church to be "non-essential" and impose criminal sanctions on Lighthouse for failing to abide by that government-imposed prescription of orthodoxy.** The Constitution demands more.

> **C.    The Commonwealth's Unconstitutional Application of the GATHERING ORDERS Restricts Lighthouse's First Amendments Rights to Speech and Assembly and Should Be Restrained.**

> > **1.    The Commonwealth's unconstitutional application of the GATHERING ORDERS discriminates against Lighthouse's speech rights and rights to assemble on the basis of content.**

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (same). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both distinctions are drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 135 S. Ct. at 2227 (emphasis added). Put simply, the Supreme Court handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Id.*

Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions of speech applies regardless of the government's alleged purpose in enacting the law, even if the alleged purpose arises from a time of purported emergency. *See id.* ("On its face, the [law] is a content-based regulation of speech. **We thus have no need to consider the government's justifications or purposes for enacting the [law] to determine whether it is subject to strict**

**scrutiny**.") In so holding, the Court rejected the lower court's rationale that the alleged purpose behind enacting the content-based law can justify subjecting it to diminished constitutional protection. *Id.* "[T]his analysis skips the crucial first step . . . determining whether the law is content neutral on its face." *Id.* at 2228. The answer to that question, the *Reed* Court said, is dispositive of the level of scrutiny applicable to the regulation of speech. *Id.* "**A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech**." *Id.* (emphasis added). "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* "Innocent motives do not eliminate the danger of censorship presented by a facially content-based statute, as future government officials may one day wield such statutes to suppress disfavored speech." *Id.* at 2229.

Thus, content-based laws must satisfy strict scrutiny, regardless of any purported justification the Commonwealth may assert. *Reed*, 135 S. Ct. at 2229. "Because the [law] imposes content-based restrictions on speech, those provision can stand only if they survive strict scrutiny." *Id.* at 2231. **There are no exceptions to this rule**. Indeed, the notion that a content-based restriction on speech is presumptively unconstitutional is "so engrained in our First Amendment jurisprudence that last term we found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115–16 (1991). "Regulations that permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Id.* at 116. Furthermore, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000). The burden is on the Commonwealth to prove it can satisfy strict scrutiny, and it cannot meet that burden.

13

This Court need look no further than the text of the GATHERING ORDERS and their application to determine that they are content-based restrictions on constitutionally protected liberties. The GATHERING ORDERS purport to prohibit "all public and private gatherings," meaning any gathering "of more than ten individuals," except a gathering "of more than ten individuals" is permissible without scrutiny or threat of sanction at many retail businesses deemed "essential," and at many more professional and retail businesses deemed "non-essential," none of which are required to observe distancing and hygiene guideless except "to the extent possible." (V.Compl. ¶¶ 27–32, EXS. B, C.) **Thus, the Commonwealth found numerous categories of businesses for which large numbers of people may gather without restraint, but expressly prohibited the constitutionally protected assemblies or "gatherings" of "religious" groups of more than 10 individuals.** The Fourth Circuit has noted that government regulations of speech are indisputably content-based where—as here—the restriction sets us a system of "carveout[s]" and "exemptions" for certain categories. *See Am. Ass'n of Political Consultants, Inc. v. FCC*, 923 F.3d 159, 166 (4th Cir. 2019). The GATHERING ORDERS and their application do precisely this. The Commonwealth has targeted "religious" gatherings of more than 10 individuals, prohibited Lighthouse from engaging in such gatherings, imposed criminal sanctions, and threatened to continue imposing such criminal sanctions for engaging in such "religious" gatherings. But the Commonwealth has created carveouts for gatherings of more than 10 individuals at liquor, warehouse, and supercenter stores, and countless other "non-essential" retail businesses. (V.Compl. ¶¶ 27–32, EXS. B, C.) That is a textbook content-based restriction on Lighthouse's constitutionally protected activities. It must therefore satisfy strict scrutiny, which it cannot do. (*See infra* section I.E.)

14

2.   **The Commonwealth's unconstitutional application of the GATHERING ORDERS represents an unconstitutional prior restraint.**

It is axiomatic that prior restraints are highly suspect and disfavored. *See Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). Indeed, "**[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity**." *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (emphasis added). "Because a censor's business is to censor, there inheres the danger that he may well be less responsive than a court . . . to the constitutionally protected interests in free expression." *Freedman v. Maryland*, 380 U.S. 51, 57-58 (1965).

> It is offensive—not only to the values protected by the First Amendment, but to the very notion of a free society—that in the context of everyday public discourse a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so. **[A] law requiring a permit to engage in such speech constitutes a dramatic departure from our national heritage and constitutional tradition**.

*Watchtower Bible & Tract Soc'y of N.Y. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002) (emphasis added); *see also Lovell v. City of Griffin*, 303 U.S. 444, 451–52 (1938) ("While this freedom from previous restraint . . . upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of that restraint was a leading purpose in the adoption of the [First Amendment]."); *Carroll v. President & Comm'r Princess Anne, et al.*, 393 U.S. 175, 181 (1968) ("**Prior restraint upon speech suppresses the precise freedom which the First Amendment sought to protect from abridgment**." (emphasis added)).

The Supreme Court has consistently permitted facial challenges to prior restraints without requiring a plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional. *See, e.g.*, *Horton v. City of St. Augustine*, 272 F.3d 1318, 1331–32 (11th Cir. 2001) ("the Supreme Court itself in *Salerno*

acknowledged [that prior restraints are the] exception to the 'unconstitutional-in-every-conceivable-application' rule") (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also United States v. Rosen*, 445 F. Supp. 2d 602, 642 (E.D. Va. 2006) (noting that First Amendment challenges are an exception to the general facial challenge rules).

Additionally, as numerous federal courts—including the Fourth Circuit—have recognized, total prohibitions on speech represent prior restraints. *See, e.g.*, *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634, 638 (4th Cir. 1999) (holding that total prohibitions "act[] as such a [prior] restraint"); *R.W.B. of Riverview, Inc. v. Stemple*, 111 F. Supp. 2d 748, 756 (S.D.W.V. 2000) ("total bans" are an unconstitutional prior restraint); *see also Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1364 (M.D. Fla. 2000) ("This Court also finds that . . . moratoria are governed by prior restraint analysis in the same manners as permitting schemes."); *D'Ambra v. City of Providence*, 21 F. Supp. 2d 106, 113–14 (D.R.I. 1998) (moratorium on protected expression that includes no indication of ending is a complete prohibition and invalid prior restraint); *ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1108 (W.D. Wash. 2005) (total prohibitions on protected expression fail prior restraint analysis). The GATHERING ORDERS are such a prior restraint.

The Fourth Circuit has explicitly noted that "prior restraints bear a heavy presumption" of unconstitutionality. *In re Murphy-Brown, LLC*, 907 F.3d 788, 797 (4th Cir. 2018); *Cox v. City of Charleston*, 416 F.3d 281, 284 (4th Cir. 2005). One of the most abhorrent systems of prior restraint is "a procedure that places unbridled discretion in the hands of a government official and might result in censorship." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1045 (7th Cir. 2002); *see also Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (holding that a prior restraint that "plac[es] unbridled discretion in the hands of a government official" is one of the "**two evils that will not be tolerated**" (emphasis added); *Child Evangelism Fellowship of Md.,*

*Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) ("The Supreme Court has long held that the government violates the First Amendment when it gives a public official unbounded discretion . . . ."). There can be no question that the GATHERING ORDERS represent a "total ban" of Lighthouse's church services, *R.W.B.*, 111 F. Supp. 2d at 756, and thus constitute a prior restraint. *Id.* More problematically, however, is that the GATHERING ORDERS place unbridled discretion in the hands of Commonwealth officials, and are thus unconstitutional.

      **3.**      **The GATHERING ORDERS unconstitutionally vest unbridled discretion in the hands of Commonwealth officials, which they have used to discriminate against Lighthouse's religious gatherings.**

      The danger inherent in the viewpoint discriminatory policies and application here is only increased by the unbridled discretion given to government officials. "When a city allows an official to ban [speech] in his unfettered control, it sanctions a device for suppression of free communication of ideas." *Saia v. People of State of N.Y.*, 334 U.S. 558, 562 (1948). "[E]ven if the government may constitutionally impose content-neutral prohibitions on a particular manner of speech **it may not condition that speech on obtaining a license or permit from a government official in that official's boundless discretion**." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 764 (1988) (emphasis added). The danger of viewpoint discrimination is "at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official." *Id.* at 763. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." *Id.* at 757. This is precisely why "**[t]he First Amendment prohibits the vesting of such unbridled discretion in a government official**." *Forsyth Cnty.*, 505 U.S. at 133 (emphasis added).

      Binding precedent from the Fourth Circuit also mandates that prior restraints not impermissibly vest County officials with unbridled discretion. *See, e.g.*, *Steakhouse*, 166 F.3dd at

638 (prior restraints must "sufficiently cabin the decision-maker's discretion"); *Child Evangelism Fellowship*, 457 F.3d at 386 ("investing government officials with boundless discretion . . . violates the First Amendment"); *Am. Entertainers*, 888 F.3d at 721 (government violates the First Amendment when it permits chief of police to determine whether certain speech is permissible without providing "concrete standards" to otherwise cabin his unbridled discretion).

Here, the GATHERING ORDERS lack specific and definite checks on the discretion of government authorities. "[T]he success of a facial challenge on the grounds that an ordinance delegates overly broad discretion to the decisionmaker rests not on whether the administrator has exercised his discretion in a content-based manner, but whether there is anything in the ordinance preventing him from doing so." *Forsyth Cnty.*, 505 U.S. at 133 n.10. Here, the GATHERING ORDERS' vesting of unbridled discretion is not only unconstitutional because there are no checks on the Commonwealth, but is even worse because the Commonwealth has **actually exercised** its unchecked discretion to prohibit religious gatherings of more than 10 individuals while not prohibiting similar non-religious gatherings. Nothing in the GATHERING ORDERS limits the authority of Commonwealth officials to target church services or religious gatherings that are abiding by social distancing, enhanced sanitizing, and personal hygiene practices while not equally targeting non-religious gatherings doing the same. In fact, that is precisely what the GATHERING ORDERS demand of Commonwealth officials. The entire scheme established by the GATHERING ORDERS enshrines the precise "arbitrary application" the doctrine of unbridled discretion was intended to prevent. *Child Evangelism Fellowship*, 457 F.3d at 386. Indeed, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975). The GATHERING ORDERS have instituted a total prohibition on

"religious" gatherings of more than 10 individuals throughout the entire forum of the Commonwealth without any standards or objective criteria for why Lighthouse's religious gatherings should be treated differently than the gathering of large numbers of people occurring daily at liquor, warehouse, and supercenter stores, and at so-called "non-essential" retail stores and other businesses. The First Amendment demands more, and so should this Court.

### D. The GATHERING ORDERS Violate the Virginia Act for Religious Freedom.

The Virginia Act for Religious Freedom, Va. Code. § 57-1, *et seq.*, prohibits the government from "substantially burden[ing] a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest. Va. Code § 57-2.02(B).

### 1. The exercise of Lighthouse's religion requires them not to forsake the assembling of themselves together.

The exercise of religion under the Virginia Act for Religious Freedom means, *inter alia*, "the exercise of religion under Article I, Section 16 of the Constitution of Virginia." Va. Code § 57-2.02(A). The Constitution of Virginia permits Lighthouse, as the exercise of religion, to "be free to profess and by argument to maintain their opinions in matters of religion," and guarantees Lighthouse will not be "**enforced, restrained, molested, or burthened in his body or goods, nor . . . otherwise suffer on account of his religious opinions or belief**." Art. I, § 16, Va. Const. (emphasis added). Lighthouse has adequately demonstrated it has sincerely held religious beliefs, rooted in Scripture's commands (*e.g.*, Hebrews 10:25), that followers of Jesus Christ are not to forsake the assembling of themselves together, and that they are to do so even more in times of peril and crisis. (V.Compl. ¶¶ 87, 169, 209, 221.) And, as *On Fire* recognized, "many Christians take comfort and draw strength from Christ's promise that 'where two or three are gathered

together in My name, there am I in the midst of them.'" *On Fire*, 2020 WL 1820249, at *8 (quoting *Matthew* 18:20). Indeed, "the Greek work translated church . . . literally means **assembly**." *Id.*

2. **The GATHERING ORDERS, and the Commonwealth's unconstitutional application of them, substantially burden Lighthouse's exercise of religion.**

Under the plain terms of the Virginia Act for Religious Freedom, the Commonwealth imposes a substantial burden when it "inhibit[s] or curtail[s] religiously motivated practice." Va. Code § 57-2.02(A). There can be no question that the GATHERING ORDERS have inhibited and curtailed Lighthouse's ability to freely exercise its religion. The GATHERING ORDERS, on their face, have prohibited Lighthouse from hosting worship services if they include more than 10 individuals. (V.Compl. ¶ 31, EX. C.) Pursuant to the explicit prohibitions in the GATHERING ORDERS, the Virginia State Police have threatened Lighthouse with the imposition of criminal citations and penalties for engaging in such religious worship services. (V.Compl. ¶¶ 34, 35, EX. D.) And, more than mere threats of criminal penalties, Lighthouse's pastor was actually given a criminal citation and summons as a result of the GATHERING ORDERS. (V.Compl. ¶ 48, EX. F.) Additionally, all of Lighthouse's members and/or attendees were told by police officers that if they showed up for an Easter Service (or any other service), they would receive similar criminal citations and sanctions. (V. Compl. ¶ 51.) These are textbook definitions of inhibitions and curtailments of religious exercise, and thus violate Va. Code § 57-2.02. They should be enjoined.

E. **The Commonwealth's Unconstitutional Application of the GATHERING ORDERS Cannot Withstand Strict Scrutiny and Should be Restrained.**

Because the GATHERING ORDERS and the targeting of churches are a content-based restriction on Lighthouse's speech and assembly rights, are neither neutral nor generally applicable, and substantially burden Lighthouse's sincerely held religious beliefs under the First Amendment and Virginia statutes (*see supra* sections I.A–D), there is no question they must

20

survive strict scrutiny. The Commonwealth is therefore subject to "the most demanding test known to constitutional law." *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997)). In fact, "**it is the rare case in which a . . . restriction withstands strict scrutiny**." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2236 (Kagan, J., concurring) (quoting *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 444 (2015)) (emphasis added). *See also Burson v. Freeman*, 504 U.S. 191, 200 (1992) ("we readily acknowledge that a law rarely survives such scrutiny"). Indeed, "**strict-scrutiny review is strict in theory but usually fatal in fact**." *Bernal v. Fainter*, 467 U.S. 216, 219 n.6 (1984) (emphasis added); *see also Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 366 (2009) (Breyer, J., concurring) ("strict scrutiny" is "a categorization that almost always proves fatal to the law in question"). This is not that rare case, and the mandatory application of strict scrutiny here condemns the Commonwealth's application of the GATHERING ORDERS to the appropriate constitutional grave.

   1. **The Commonwealth's unconstitutional application of the GATHERING ORDERS and discriminatory treatment of "religious" gatherings is not supported by a compelling interest.**

When "[a] speech-restrictive law with widespread impact" is at issue, "**the government must shoulder a correspondingly heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights**." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018) (emphasis added). Here, because the GATHERING ORDERS infringe upon Lighthouse's free speech rights, the government "must do more than simply posit the existence of the disease sought to be cured. **It must demonstrate that the recited harms are real, not merely conjectural**." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (regulation of speech must still demonstrate that the alleged harm is not "mere speculation or conjecture"); *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 841

(1978) (same). This is so because "[d]eference to [the government] cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978).

To be sure, efforts to contain the spread of a deadly disease are "compelling interests of the highest order." *On Fire*, 2020 WL 1820249, at *7. Lighthouse does not doubt the sincerity of the Commonwealth's assertion of such an interest. But where the Commonwealth permits regular gatherings of more than 10 persons for commercial, non-religious, and even so-called "non-essential" retail reasons, while expressly prohibiting Lighthouse's "religious" gatherings of like kind, the government's assertions of a compelling interest are substantially diminished. Put simply, the GATHERING ORDERS "cannot be regarded as protecting an interest of the highest order . . . **when [they] leave[] appreciable damage to that supposedly vital interest unprohibited**." *Republican Party of Minn. v. White*, 536 U.S. 765, 780 (2002) (emphasis added); *see also Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2232 (2015) (same). Indeed, where the government creates a large system of exceptions, such as the Commonwealth's system of exempted businesses where people can gather without limit (V. Compl. ¶¶ 27–32), the Supreme Court has recognized that such exceptions "can raise 'doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker.'" *Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448 (2015) (quoting *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011)). The GATHERING ORDERS thus "have every appearance of a prohibition that society is prepared to impose upon [Lighthouse's religious gatherings] but not on itself." *The Florida Star v. B.J.F.*, 491 U.S. 524, 542 (1989) (Scalia, J., concurring). In fact, the GATHERING ORDERS suggest that the Commonwealth is prepared to accept the risk of gatherings at liquor, warehouse, supercenter, and so-called "non-essential" retail stores, but cannot stomach Lighthouse's assembly for a church

service, even with strict social distancing that is good enough for others when practiced "to the extent possible." The Commonwealth cannot permit broad swaths of gatherings, carrying the same (if not greater) risk than that posed by Lighthouse's church services, and still claim constitutional compliance. "Such a prohibition does not protect an interest of the highest order." *Id.*

> **2.    The Commonwealth cannot satisfy its burden of proving narrow tailoring because the GATHERING ORDERS are not the least restrictive means.**

Lighthouse "**must be deemed likely to prevail unless the government has shown that [Lighthouse's] proposed less restrictive alternatives are less effective than enforcing the act**." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (emphasis added). Indeed, to prove narrow tailoring, the Commonwealth is required to demonstrate that there are no less restrictive means capable of achieving its desired result. *See, e.g.*, *Boos v. Berry*, 485 U.S. 312, 329 (1988) (when content-based restrictions on speech are analyzed under strict scrutiny, an ordinance "is not narrowly tailored [where] a less restrictive alternative is readily available"); *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989) (noting that under "the most exacting scrutiny" applicable to content-based restrictions on speech, the government must employ the least restrictive alternative to pass narrow tailoring). The Commonwealth bears the burden of demonstrating narrow tailoring as a matter of law, and that is a burden it simply cannot satisfy here. Less restrictive means are available, and that alone condemns the Commonwealth's application of the GATHERING ORDERS to failure under strict scrutiny.

> **a.    The Commonwealth bears the burden of demonstrating narrow tailoring and least restrictive means.**

Even on a motion for TRO or PI, the Commonwealth unquestionably bears the burden of demonstrating that the GATHERING ORDERS are narrowly tailored. As the Supreme Court has held: "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O*

*Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). As such, on a preliminary injunction motion, **the government**—not the movant—bears the burden of proof on narrow tailoring, because **the government** bears that burden at trial. *See Ashcroft*, 542 U.S. at 665 (on preliminary injunction motion, "**the burden is on the government** to prove that the proposed alternatives will not be as effective as the challenged statute." (emphasis added)).

The Commonwealth indisputably bears the burden of proving narrow tailoring at trial. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *id.* at 2540 ("To meet the requirement of narrow tailoring, **the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." (emphasis added)). Thus, the Commonwealth also bears—and falls woefully short of meeting—the burden of proving narrow tailoring here. *See Gonzales*, 546 U.S. at 429; *Ashcroft*, 542 U.S. at 665.

> **b.      The Commonwealth cannot demonstrate that it seriously considered less speech restrictive alternatives and ruled them out for good reason.**

The Commonwealth flunks the narrow tailoring strict scrutiny test for a simple reason. In connection with its narrow tailoring burden, the Commonwealth must show that it "**seriously** undertook to address the problem with less intrusive tools readily available to it," meaning that it "**considered different methods that other jurisdictions have found effective**." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). "To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. Thus, the Commonwealth "would have to show either that **substantially less-**

**restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016) (emphasis added).

The Commonwealth utterly fails this test. The Commonwealth tried nothing else. It considered nothing else but a complete prohibition. The Commonwealth jumped straight to a purported ban on "all public and private gatherings of more than ten individuals," and proclaimed that "religious" gatherings were included among the prohibition. (V.Compl. ¶ 31, EX. C.) But the Commonwealth drove a Mack Truck through its prohibition by expansively exempting numerous businesses and non-religious entities, such as liquor, warehouse, and supercenter stores, and so-called "non-essential" retail stores. (V.Compl. ¶¶ 27–32.) The Commonwealth has not and cannot state why or how gathering with a large number of persons at a warehouse or supercenter store (*i.e.*, browsing, shopping, coughing, sneezing, and touching surfaces, all while moving in the midst of crowds and masses that turn over by the hundreds throughout a day, with distancing and hygiene practiced only "to the extent possible") is any less "dangerous" to public health than attending a time-limited worship service, where distancing and hygiene are strictly observed, in a space used for no more than a few hours once per week. Yet the Commonwealth exempted the non-religious gatherings and prohibited Lighthouse's church services. Quite simply, the Commonwealth imposed a draconian religious gathering prohibition "not reasonably restricted to the evil with which it is said to deal." *Butler v. Michigan*, 352 U.S. 380, 383 (1957). The Commonwealth tried nothing else, and for that reason alone, fails the narrow tailoring analysis required under *McCullen*.

        c.     **The numerous other COVID-19 orders specifically exempting religious gatherings or treating them equally to non-religious**

> **gatherings demonstrates less restrictive and non-discriminatory alternatives exist.**

Even if the Commonwealth could substantiate compelling interests for the GATHERING ORDERS' discriminatory application to religious gatherings of more than ten individuals, which it cannot, the Commonwealth could not meet its burden of showing that the GATHERING ORDERS are narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). There must be a 'fit between the . . . ends and the means chosen to accomplish those ends.'" *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 572 (2011). While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity, government may regulate the area of First Amendment freedoms only with narrow specificity." *Ward*, 491 U.S. at 794.

The Supreme Court has clearly established that "[t]he government may not regulate ['a mode of speech'] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992) (internal quotation marks omitted). The GATHERING ORDERS impose discriminatory and disparate treatment on "religious" gatherings that are not applied to similar or larger non-religious gatherings. Where other, content-neutral alternatives exist, such as here, government cannot fulfill its narrow tailoring burden by ignoring those alternatives. *See id.* at 395 ("The existence of adequate content-neutral alternatives thus undercut significantly any defense of such a statute, casting considerable doubt on the government's protestations that the asserted justification is in fact an accurate description of the purpose and effect of the law." (internal quotation marks and citation omitted)).

As shown in the Verified Complaint, the Commonwealth has ignored numerous other, less restrictive means of achieving its purported interest. One option tried successfully in other

jurisdictions is to exempt religious gatherings from gathering prohibitions altogether. The States of Florida, Indiana, and Texas have declared religious gatherings essential activities which may continue, instead of declaring such constitutionally protected activities "non-essential" with a stroke of a pen. (V.Compl. ¶¶ 64, 65, 70, EXS. H, I, N.) The Commonwealth has refused to consider or attempt it. Another less restrictive alternative would be to allow churches to continue in-person services provided they agree to maintain adequate social distancing, enhanced sanitizing, and personal hygiene practices, like those allowed at other non-religious gatherings of more than ten individuals. Arizona, Arkansas, Alabama, and Connecticut have all permitted such an exception for religious gatherings. (V.Compl. ¶¶ 66–70, EXS. J–M.) Lighthouse has demonstrated it already engages in the recommended social distancing, enhanced sanitizing, and personal hygiene practices recognized by the Commonwealth as sufficient for non-religious gatherings (V.Compl. ¶¶ 54–57.) There is no justification for depriving Lighthouse of the same benefits afforded to non-religious gatherings that are permissible under the GATHERING ORDERS.

Indeed, as the Western District of Kentucky has already exquisitely stated, the Commonwealth is unlikely to be able to demonstrate that it deployed the least restrictive means because the GATHERING ORDERS and their application

> are **"underinclusive"** *and* **"overbroad."** They're underinclusive because they don't prohibit a host of equally dangerous (or equally harmless) activities that the Commonwealth has permitted . . . . Those . . . activities include driving through a liquor store's pick-up window, parking in a liquor store's parking lot, or walking into a liquor store where other customers are shopping. The Court does not mean to impugn the perfectly legal business of selling alcohol, nor the legal and widely enjoyed activity of drinking it. But if beer is "essential," **so is [church]**.

*On Fire Christian Ctr.*, 2020 WL 1820249, at *7 (emphasis added) (footnote omitted).

Further, as the District of Kansas stated, "where comparable secular gatherings are subjected to much less restrictive conditions" than "the broad prohibition against in-person

religious services," the government is not likely to meet its burden that it deployed the least restrictive means. *First Baptist*, 2020 WL 1910021, at *8.

Put simply, the Commonwealth's failure to try other available alternatives that have worked and are working in other jurisdictions across the country demonstrates that it has not and cannot satisfy its burden to demonstrate that its actions are narrowly tailored. It thus fails strict scrutiny, and the TRO and PI are warranted.

## II. LIGHTHOUSE HAS SUFFERED, IS SUFFERING, AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT A TRO AND PRELIMINARY INJUNCTION.

Governments are not empowered to create "First Amendment Free Zones" within their borders, like the Commonwealth has done here. *See, e.g.*, *Bd. of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (striking local government's attempt to prohibit protected expression within a "First Amendment Free Zone."); *United States v. Stevens*, 559 U.S. 460, 470 (2010) (government in not empowered to create First Amendment free zones with respect to certain categories of speech). Saying that Lighthouse may avoid irreparable injury by simply "watching church services online" or doing "drive-through" or "drive-in" services while foregoing established constitutional rights is simply insufficient under the First Amendment. Indeed, "[v]iolations of first amendment rights constitute per se irreparable injury," *Johnson v. Berglan*, 586 F.2d 993, 995 (4th Cir. 1978), and it does not matter that such an injury could be reduced by not following the dictates of Lighthouse's sincerely held religious beliefs because "even minimal infringements upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009).

Not only is the Commonwealth's invitation for Lighthouse and its members to "stay home and watch church online" itself offensive and baseless as a matter of settled law, it also betrays the

Commonwealth's failure to understand that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Indeed, "[i]t is well established in the Fourth Circuit that violations of first amendment rights" are **presumed** to impose irreparable injury. *Vollette v. Watson*, 978 F. Supp. 2d 572, 584 (E.D. Va. 2013). *See also* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that **no further showing of irreparable injury is necessary**." (emphasis added)). Thus, demonstrating irreparable injury in this matter "**is not difficult. Protecting religious freedom was a vital part of our nation's founding, and it remains crucial today**." *On Fire*, 2020 WL 1820249, at *9 (emphasis added).

## III.   THE BALANCE OF THE EQUITIES TIPS DECIDEDLY IN LIGHTHOUSE'S FAVOR.

An injunction in this matter will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). The granting of a TRO and PI enjoining enforcement of the GATHERING ORDERS on Lighthouse's worship services will impose no harm on the Commonwealth. Indeed, the Commonwealth "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." *Legend Night Club v. Miller*, 637 F.3 291, 302–03 (4th Cir. 2011). *See also Newsom ex rel. Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003) (the government "is in no way harmed by issuance of a preliminary injunction which prevents it from enforcing a regulation, which, on this record, is likely to be found unconstitutional"). But for Lighthouse, as noted above, even minimal infringements upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief. *Legend Night Club*, 637 F.3d at 302. As such, there can be no comparison

between the irreparable and unconscionable loss of First Amendment freedoms suffered by Lighthouse absent injunctive relief and the non-existent interest the Commonwealth has in enforcing unconstitutional GATHERING ORDERS. Absent a TRO, Lighthouse and its members "face an impossible choice: skip [church] service[s] in violation of their sincere religious beliefs, or risk arrest, mandatory quarantine, or some other enforcement action for practicing those sincere religious beliefs." *On Fire*, 2020 WL 1820249, at *9. The balance of the equities tips decidedly in Plaintiffs' favor, and the TRO and PI should issue.

## IV. THE PUBLIC INTEREST WARRANTS A TRO AND PRELIMINARY INJUNCTION.

As the Fourth Circuit has noted, "**[s]urely, upholding constitutional rights serves the public interest**." *Newsom ex rel. Newsom v. Albemarle Cnty. Pub. Schs.*, 354 F.3d 249, 261 (4th Cir. 2003) (emphasis added); *Legend Night Club*, 637 F.3d at 303 ("upholding constitutional rights is in the public interest"). "Injunctions protecting First Amendment freedoms are **always in the public interest**." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added). This protection is *ipso facto* in the interest of the general public because "First Amendment rights are not private rights [but] rights of the general public [for] the benefits of all of us." *Machesky v. Bizzell*, 414 F.2d 283, 288–90 (5th Cir. 1969) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)). There is no "evidence that churches are less essential than every other business that is currently allowed to be open," *On Fire*, 2020 WL 1820249, at *9, and "**the public has a profound interest in men and women of faith worshipping together [in church] in a manner consistent with their conscience**." *Id.* (emphasis added).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court issue the TRO and PI as set forth in the Prayer for Relief in Plaintiffs' Verified Complaint (V.Compl. at 45–49.)

Respectfully submitted,

/s/ Daniel J. Schmid
Mathew D. Staver*
Horatio G. Mihet*
Roger K. Gannam*
Daniel J. Schmid (VA 84415)
**Attorneys for Plaintiff**
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
(407) 875-1776
court@lc.org
hmihet@lc.org
rgannam@lc.org
dschmid@lc.org

*Pro hac vice applications pending

31