UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

|  |  |
|---|---|
| LIGHTHOUSE FELLOWSHIP CHURCH,<br><br>Plaintiff,<br><br>v.<br><br>RALPH NORTHAM, in his official capacity<br>as Governor of the Commonwealth of Virginia,<br><br>Defendant. | Civil No. 2:20cv204 |

## ORDER

Pending before the Court is Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.  ECF No. 3.  For the following reasons, the Motion (ECF No. 3) is **DENIED**.  The Court has determined that no hearing is necessary to decide this Motion because the facts and arguments are adequately presented in the Verified Complaint, the exhibits to the Verified Complaint, and the briefing on Plaintiff's Motion.

## I.      BACKGROUND

In January 2020, China identified a novel coronavirus causing a pneumonia-like illness. Sui-Lee Wee and Donald G. McNeil, Jr., *China Identifies New Virus Causing Pneumonialike Illness*, N.Y. TIMES (Jan. 8, 2020), https://www.nytimes.com/2020/01/08/health/china-pneumonia-outbreak-virus.html.  Less than three months later, on March 11, 2020, the World Health Organization ("WHO") declared the novel coronavirus a pandemic.  *See* WHO Director-General's opening remarks at the media briefing on COVID-19 – 11, March 2020 (March 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.  The WHO "called . . . for countries to take urgent and

aggressive action . . . ." *Id.* The WHO advised that "[a]ll countries must strike a fine balance between protecting health, minimizing economic and social disruption, and respecting human rights. . . . This is not just a public health crisis, it is a crisis that will touch every sector – so every sector and every individual must be involved in the fight. . . . [C]ountries must take a whole-of-government, whole-of-society approach, built around comprehensive strategy to prevent infections, save lives and minimize impact." *Id.*

Despite the WHO's urging that all countries take swift and aggressive action to halt the spread of the novel coronavirus, it spread quickly across the United States. *See* Centers for Disease Control and Prevention ("CDC"), Situation Summary (April 19, 2020), https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html. To date, over three million people worldwide have been diagnosed as infected with the novel coronavirus. *See* Johns Hopkins Medical Center: Coronavirus Resource Center, *COVID-19 Map* (last visited May 1, 2020), https://coronavirus.jhu.edu/map.html. Nearly one third (*i.e.*, over one million) of those diagnoses are in the United States. *Id.* Over two hundred thousand people have died worldwide. *Id.* More than one-quarter of those deaths (*i.e.*, sixty-three thousand) have occurred in the United States.[1] *Id.* There is currently no vaccine for the novel coronavirus, and it remains unlikely that one will be developed in the coming months. *See* Knvul Sheikh & Katie Thomas, *More Coronavirus Vaccines and Treatments Move Towards Human Trials*, N.Y. TIMES (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/health/coronavirus-vaccines.html.

---

[1] Data suggest that the death toll is much higher than reported. *See* Josh Katz, Denise Lu, & Margot Sanger, *U.S. Coronavirus Death Toll Is Far Higher Than Reported, C.D.C. Data Suggests*, N.Y. TIMES (Apr. 28, 2020), https://www.nytimes.com/interactive/2020/04/28/us/coronavirus-death-toll-total.html?action=click&module=Spotlight&pgtype=Homepage.

The CDC has announced that the novel coronavirus ("COVID-19") is spread primarily through in-person interactions, either "[b]etween people who are in close contact with one another" or "[t]hrough respiratory droplets produced when an infected person coughs, sneezes or talks." *See* CDC, *How COVID-19 Spreads* (last updated Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.  It can be spread by people who are not showing symptoms and do not know they are infected with the virus.  *Id.*  The virus can travel up to thirteen feet through the air, and can live on surfaces, including shoes, for long periods of time.  *See* Zhen-Dong Guo, et al., *Aerosol and Surface Distribution of Severe Acute Respiratory Syndrome Coronavirus 2 in Hospital Wards, Wuhan, China, 2020*, 26 Emerging Infectious Diseases 7 (2020), https://doi.org/10.3201/eid2607.200885.

Consistent with this information, the CDC currently recommends that everyone practice social distancing.  *See* CDC, *How COVID-19 Spreads* (last updated Apr. 13, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.  Social distancing requires staying at least six feet away from other people and "avoid[ing] large and small gatherings."  *See* CDC, *What is Social Distancing?* (last updated Apr. 4, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html.

At the end of March 2020, the President of the United States and the CDC issued guidance intended to slow the spread of this deadly pandemic in the United States.  *See* The President's Coronavirus Guidelines for America*, 30 Days to Slow the Spread* (March 31, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.  The CDC and President recommend that all people avoid social gatherings of more than ten people; work and attend school from home whenever possible; avoid eating or drinking at bars, restaurants, and food courts; avoid discretionary travel, shopping or social

visits; and practice good hygiene. *Id.* The Guidance advises "Governors of states with evidence of community transmission [to] close schools, . . . bars, restaurants, food courts, gyms, and other indoor and outdoor venues where groups of people congregate . . . ." *Id.*

Taking the recommendations of both the WHO and CDC under consideration, the Governor of Virginia issued Executive Order 53 suspending "all public and private in person gatherings of more than 10 individuals" through June 10, 2020. Executive Order 53, Ex. B to Mot. for TRO, ECF No. 1-3. The Order closed schools for the remainder of the school year and closed "all dining and congregation areas in restaurants, dining establishments, food courts, breweries, microbreweries, distilleries, wineries, tasting rooms, and farmers markets . . . ." *Id.* It closed "all public access to recreational and entertainment businesses" including "[t]heaters, performing arts centers, concert venues, museums, and other indoor entertainment centers; [f]itness centers, gymnasiums, recreation centers, indoor sports facilities, and indoor exercise facilities; [b]eauty salons, barbershops, spas, massage parlors, tanning salons, tattoo shops . . . ; [r]acetracks and historic horse racing facilities; and [b]owling alleys, skating rinks, arcades, amusement parks, trampoline parks, fairs, arts and craft facilities, aquariums, zoos, escape rooms, indoor shooting ranges, public and private social clubs, and all other places of indoor public amusement." *Id.*

Executive Order 53 identified some exceptions from these restrictions. "Essential retail businesses may remain open during normal business hours." *Id.* The Order defines essential businesses as "[g]rocery stores, pharmacies, and other retailers that sell food and beverage products or pharmacy products, including dollar stores, and department stores with grocery or pharmacy operations; [m]edical, laboratory, and vision supply retailers; [e]lectronic retailers that sell or service cell phones, computers, tablets, and other communications technology; [a]utomotive parts, accessories, and tire retailers as well as automotive repair facilities; [h]ome improvement, hardware,

4

building material, and building supply retailers; [l]awn and garden equipment retailers; [b]eer, wine, and liquor stores; [r]etail functions of gas stations and convenience stores; [r]etail located within healthcare facilities; [b]anks and other financial institutions with retail functions; [p]et and feed stores; [p]rinting and office supply stores; and [l]aundromats and dry cleaners." *Id.*

The Order permits other "brick and mortar retail businesses" to remain open if they "limit all in person shopping to no more than [ten] patrons per establishment" and "adhere to . . . proper social distancing requirements . . . ." *Id.* The Order permits "business operations offering professional rather than retail services to remain open," but directs that "they should utilize teleworking as much as possible. Where telework is not feasible, such business[es] must adhere to social distancing recommendations, enhanced sanitization practices on common surfaces, and apply the relevant workplace guidance from state and federal authorities." *Id.*

On March 30, 2020, the Governor supplemented Executive Order 53 with Executive Order 55, directing "[a]ll individuals in Virginia [to] remain at their place of residence," subject to certain exceptions. Ex. C to Mot. for TRO, ECF No. 1-4. These exceptions are: "[o]btaining food, beverages, goods, or services as permitted in Executive Order 53; [s]eeking medical attention, essential social services, governmental services, assistance from law enforcement, or emergency services; [t]aking care of other individuals, animals, or visiting the home of a family member; [t]raveling required by court order to facilitate child custody, visitation, or childcare; [e]ngaging in outdoor activity, including exercise, provided individuals comply with social distancing requirements; [t]raveling to and from one's residence, place of worship, or work; [t]raveling to and from an educational institution; [v]olunteering with organizations that provide charitable or social services; and [l]eaving one's residence due to a reasonable fear for health or safety, at the direction of law enforcement, or at the direction of another government agency." *Id.*

Executive Order 55 reiterated that "[a]ll public and private in-person gatherings of more than ten individuals are prohibited.  This includes parties, celebrations, religious, or other social events, whether they occur indoor or outdoor.  This restriction does not apply . . . [t]o the operation of businesses not required to close to the public under Executive Order 53; or . . . [t]o the gathering of family members living in the same residence."  *Id.*  "Institutions of higher education" were ordered to "cease all in-person classes and instruction, and [to] cancel all gatherings of more than ten individuals."  *Id.*  Public beaches were ordered closed, except that they may be used by individuals to exercise or fish.  *Id.*

On April 1, 2020, the Virginia State Police issued a Media Release outlining the Virginia State Police Enforcement Practice regarding the Governor's Orders.  Ex. D to Mot. for TRO, ECF No. 1-5.  The release noted that "[t]he Virginia State Police encourages all Virginians to adhere to Virginia Governor Northam's directives and [to] do their part [to slow the spread of COVID-19] by staying home . . . ."  *Id.*  It informed the public that "Governor Northam has directed state and local law enforcement to initially address violations of [the Governor's Orders] with education and warnings.  Persistent violation . . . can result in an individual[] or business being charged with a class one misdemeanor, which carries up to a year in jail and a $2,500 fine."  *Id.*

On Sunday, April 5, 2020, a Town of Chincoteague Police Department Officer stopped by Plaintiff's building to inquire whether Plaintiff planned to host a religious service that day.  Verified Compl. at 11, ECF No. 1.  The Officer informed a member of Plaintiff's Board of Directors that Plaintiff was not permitted to have more than ten people in attendance, and that all attendees must be spaced six feet apart.  *Id.* at 12.  Despite this warning, Plaintiff held a Sunday worship service that violated the Governor's Orders by having sixteen people in attendance.  *Id.* at 11.  The Pastor of Lighthouse Fellowship Church ("Lighthouse" or "Plaintiff") was issued a criminal

citation and summons subsequently.  *Id.* at 12–13; Ex. F to Verified Compl., ECF No. 1-7.  The

Pastor of Lighthouse inquired whether he would be further criminally cited if Plaintiff held a reli-

gious worship service on Easter Sunday.  Verified Compl. at 13, ECF No. 1.  Officers informed

him that should Lighthouse host any gathering with more than ten people in attendance, every

person in attendance would be given a criminal citation for violating the Governor's Orders.  *Id.*

Plaintiff filed its Verified Complaint on April 24, 2020.  *Id.*  Plaintiff argues that the Gov-

ernor's Orders insufficiently protect religious liberty, despite permitting religious establishments

to remain open, exempting travel to and from places of worship from the stay at home order, and

allowing in-person religious gatherings of ten people or fewer.  Plaintiff seeks "a Temporary Re-

straining Order restraining and enjoining Governor Northam, all Commonwealth officers, agents,

employees, and attorneys, and all other persons in active concert or participation with them, from

enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with

the [Governor's Orders] . . . to the extent any such order prohibits religious worship services at

Lighthouse, or in-person church services at Lighthouse if Lighthouse meets the social distancing,

enhanced sanitization, and personal hygiene guidelines pursuant to which the Commonwealth al-

lows so-called 'essential' commercial and non-religious entities . . . to accommodate gatherings of

persons without numerical limits."  Verified Compl. at 45, ECF No. 1.

Plaintiff also seeks "a Preliminary Injunction pending trial, and a Permanent Injunction

upon judgment, restraining and enjoining Governor Northam, all Commonwealth officers, agents,

employees, and attorneys, and all other persons in active concert or participation with them, from

enforcing [the Governor's Orders]" against any religious gathering, so long as it complies "with

the same social distancing and personal hygiene recommendations pursuant to which the

Commonwealth allows so-called 'essential and non-religious entities . . . to accommodate gatherings of persons without numerical limit . . . ." *Id.* at 45–46.

## II.    LEGAL STANDARD

A temporary restraining order ("TRO") is an emergency measure and should be utilized sparingly.  *See* 11A Charles Wright and Arthur R. Miller, Federal Practice and Procedure § 2951 (2d ed).  Federal Rule of Civil Procedure 65(b) permits the Court to issue a TRO "without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required."  Under Rule 65(a), the Court may issue a preliminary injunction only on notice to the adverse party.

"For a plaintiff to demonstrate that it deserves [either a TRO or a preliminary injunction], it 'must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction or TRO; (3) the balance of the equities tips in its favor; and (4) the injunction or TRO is in the public interest.'"  *USA English Language Ctr. v. Accrediting Council for Higher Educ. & Training, Inc.*, No. 1:19cv945, 2019 WL 7816855, at *1 (E.D. Va. Sept. 11, 2019) (internal alterations omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "The failure to show any one of the relevant factors mandates denial of the preliminary injunction or TRO."  *Id.* (internal alterations omitted) (quoting *Parson v. Alcorn*, 157 F. Supp. 3d 479, 491 (E.D. Va. 2016)).

III.   **ANALYSIS**

Plaintiff has not shown a likelihood of success on the merits, that the balance of the equities tips in its favor, or that injunctive relief is in in the public interest.  Accordingly, Plaintiff's request for a TRO and its request for a preliminary injunction must be denied.

A.   **Likelihood of Success on the Merits**

Plaintiff has not shown a likelihood of success on the merits on any of the claims asserted in its Motion for a TRO.  Similarly, this failure extends to its arguments for a preliminary injunction.

i.   <u>Free Exercise of Religion</u>

Plaintiff argues that it is likely to succeed on the merits because the Governor's Orders violate Plaintiff's right to free exercise of religion.  Plaintiff is not likely to succeed on this claim.

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."  U.S. Const. amend. I.  But this right is not absolute.  "The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority . . . essential to the safety[ and] health . . . of the community."  *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).

"In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 531 (1993) (citation omitted).  *Id.*  A law is *not* neutral where

> the object of [the] law is to infringe upon or restrict practices *because* of their religious motivation . . . .  To determine the object of [the] law, we must begin with its

9

> text, for the minimum requirement of neutrality is that a law not discriminate on its
> face.  A law lacks facial neutrality if it refers to a religious practice without a secular
> meaning discernible from the language or context.

*Id.* at 533–34 (emphasis added).

General applicability, on the other hand, turns on whether the law is underinclusive.  *Id.* at 542.  "All laws are selective to some extent . . . ."  *Id.*  But a law fails the test of general applicability where, "in pursuit of legitimate interests, [the government] in a selective manner impose[s] burdens only on conduct motivated by religious belief . . . ."  *Id.* at 543.

The Governor's Orders are facially neutral.  They do not refer to a religious practice to single it out for discriminatory treatment.  They prohibit *all* social gatherings of more than ten individuals, secular and religious.  *See* Executive Order 53, Ex. B. to Verified Compl., ECF No. 1-3 ("[*A*]*ll* public and private in person gatherings of more than 10 individuals are prohibited . . . ."); Executive Order 55, Ex. C to Verified Compl., ECF No. 1-4 ("*All* public and private in-person gatherings of more than ten individuals are prohibited.  This includes parties, celebrations, religious, or other social events . . . ." (emphasis added)).

Plaintiff argues that Executive Order 55 is not facially neutral because it mentions religious events as falling under the broad and obviously neutral umbrella of "all public and private in-person gatherings of more than ten individuals."  Executive Order 55, Ex. C to Verified Compl., ECF No. 1-4.  Executive Order 55 presents no neutrality problem; it merely uses religious gatherings as one of several examples of "all public and private in-person gatherings."  The Orders are facially neutral.

However,

> [f]acial neutrality is not determinative.  The Free Exercise Clause . . . extends be-
> yond facial discrimination.  The Clause forbids subtle departures from neutrality,
> and covert suppression of particular religious beliefs.  Official action that targets
> religious conduct for distinctive treatment cannot be shielded by mere compliance

with the requirement of facial neutrality.  The Free Exercise Clause protects against
governmental hostility which is masked, as well as overt.

*Church of the Lukumi Babalu Aye*, 508 U.S. at 534 (quotations omitted).  Such covert departures

from neutrality can be discerned from the legislative history of the allegedly discriminatory law,

or from "the effect of a law in its real operation . . . ." *Id.* at 535.  The Court is sensitive to the fact

that "adverse impact will not always lead to a finding of impermissible targeting.  For example, a

social harm may have been a legitimate concern of government for reasons quite apart from dis-

crimination." *Id.*

Although specific evidence of the Governor's motives in drafting these Orders has not been

presented, widespread coverage of the spread of the COVID-19 pandemic and of the risk it poses

to human life plainly leads to the strong inference at this stage that the Orders were not drafted

with any discriminatory intent or religious animosity.  This is particularly true within the scope of

Executive Order 55, which singles out religion for *favorable* treatment by recognizing the im-

portance of traveling to and from places of worship.  Executive Order 55, Ex. C to Mot. for TRO,

ECF No. 1-4.

Accordingly, evaluating whether the Governor's Orders are neutral requires examining if

the orders are some sort of "religious gerrymander, an impermissible attempt to target [Plaintiff]

and [its] religious practices." *Church of the Lukumi Babalu Aye*, 508 U.S. at 535 (quotation omit-

ted).  Plaintiff argues that the Orders are being used to target "churches and churchgoers" because

they "carve out broad exemptions for a host of secular activities, many of which bear similarities

to the sort of personal contact that will occur during in-person religious services."  Mot. for TRO

at 7, ECF No. 3.  Plaintiff mischaracterizes the Governor's Orders and provides inapt examples of

alleged targeting.

11

A fair examination of the Orders reveals that Plaintiff's characterizations of the Orders are inaccurate.  They do not carve out a "host" of secular activities that are similar to large religious worship services.  Again, General Order 53 suspends "all public and private in person gatherings of 10 or more individuals" through June 10, 2020.  Executive Order 53, Ex. B to Verified Compl, ECF No. 1-3.  The Order closed schools for the remainder of the school year, closed "all dining and congregation areas in restaurants, dining establishments, food courts, breweries, microbreweries, distilleries, wineries, tasting rooms, and farmers markets; . . . [t]heaters, performing arts centers, concert venues, museums, and other indoor entertainment centers; [f]itness centers, gymnasiums, recreation centers, indoor sports facilities, and indoor exercise facilities; [b]eauty salons, barbershops, spas, massage parlors, tanning salons, tattoo shops; racetracks and historic horse racing facilities; [b]owling alleys, skating rinks, arcades, amusements parks, trampoline parks, fairs, arts and craft facilities, aquariums, zoos, escape rooms, indoor shooting ranges, public and private social clubs, and all other places of indoor public amusement."  *Id.*  The Order closed public beaches, except for individual exercise and fishing.  *Id.*  In short, the Order's plain intent is to close all establishments where individuals might be tempted to gather in groups larger than ten.

The Governor did not order the closure of churches and other religious establishments, although they fall within the CDC's guidance to close "indoor and outdoor venues where groups of people congregate."  *See* The President's Coronavirus Guidelines for America*, 30 Days to Slow the Spread* (March 31, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.  Executive Order 55 clearly identifies and excludes from restrictions individuals who are "[t]raveling to and from one's . . . place of worship . . . ."  Executive Order 55, Ex. C to Mot. for TRO, ECF No. 1-4.

The "host" of carved out gatherings is limited and bears little similarity to large religious worship services. Executive Order 53 included a *limited* carveout for "essential retail businesses," which are defined as "[g]rocery stores, pharmacies, and other retailers that sell food and beverage products or pharmacy products, including dollar stores and department stores with grocery or pharmacy options; [m]edical, laboratory, and vision supply retailers; [e]lectronic retailers that sell or service cell phones, computers, tablets, and other communication technology; [a]utomotive parts, accessories, and tire retailers as well as automotive repair facilities; [h]ome improvement, hardware, building material, and building supply retailers; [l]awn and garden equipment retailers; [b]eer, wine, and liquor stores; [r]etail functions of gas and convenience stores; [r]etail located within healthcare facilities; [b]anks and other financial institutions with retail functions; [p]et and feed stores; [p]rinting and office supply stores; and [l]aundromats and dry cleaners." *Id.* This limited carveout does not target religious gatherings. It simply ensures that people have access to essential goods.

Plaintiff appears to assert that many of these businesses are mistakenly construed as essential. The Court disagrees. People must have access to food, medicine, and water in the midst of a pandemic. People need to protect their vision (particularly our frontline healthcare workers, many of whom, it may be safely assumed, may wear glasses or contacts). Medical centers and laboratories are in desperate need of supplies.

With more people working from home, people need access to electronic equipment, to the parts and labor necessary to repair their electronic devices, and to printing and office supplies. Home improvement and lawn and garden retailers serve an essential purpose in a pandemic. Access to the tools necessary for repairing one's home is essential. Many may be unable to find or afford to pay others to make critical repairs to their homes. Some are commencing or expanding

food production at home, thereby reducing the need to visit public spaces such as the grocery. Many small farmers and farmers' market providers are redoubling efforts to keep their communities fed.  They need access to supplies.

Plaintiff complains especially that stores and other establishments selling alcohol should not be deemed essential.  What constitutes an essential establishment takes into consideration the potential impact upon physical health if the establishment is ordered closed.  The danger posed by sudden alcohol withdrawal to those suffering from alcohol dependence, and the added burden upon health facilities that this might trigger, are significant factors that must be considered.

Similarly, gas station retail centers are properly deemed as essential for the purposes of these Orders.  Such centers usually sell food, milk, and other essential goods.  And the gas stations must be open and staffed since, *at the very least*, healthcare professionals and grocery store personnel need to get to and from their essential jobs.  Gas station retail centers are also often a source of food and other essential goods for the workers responsible for transporting goods across the country and ensuring that our grocery stores and other essential businesses remain stocked.  Retail centers located within healthcare facilities provide critically needed goods to healthcare workers and patients confined to hospitals.

Shutting down banks and other financial institutions would exacerbate the widespread economic crisis.  Pet and feed stores are essential for ensuring that our animals do not suffer, and for ensuring that the country's livestock supply is not threatened.  Laundromats and dry cleaners are essential for maintaining hygiene, which is being promoted as the best defense against COVID-19.

Plaintiff argues that the Orders target religious institutions unfairly because the essential businesses are not restricted to ten customers at a time.  This argument fails.  Imposing such

14

restrictions on essential businesses would threaten adequate access to food, water, medicine, and other goods and services necessary to keep individuals and their families alive and functioning during this pandemic. Many people would go without essential goods and services despite being in dire need of them.

Similarly, the Governor's Orders have permitted businesses providing professional services to remain open and have not imposed ten-person limits on those businesses. Those businesses have been directed to utilize teleworking as much as possible. *Where teleworking is not possible*, these businesses are permitted to have more than ten people gathered (and they must still abide by social distancing requirements). *See* Executive Order 53, Ex. B to Mot. for TRO, ECF No. 1-3. Although these businesses may not be essential, the exception crafted on their behalf is essential to prevent joblessness at a time when people desperately need to retain their incomes and healthcare, and at a time when unemployment is drastically rising. *See* Bureau of Labor Statistics, The Employment Situation – March 2020 (Apr. 3, 2020), https://www.bls.gov/news.release/pdf/empsit.pdf (documenting the impact of the COVID-19 pandemic on unemployment).

These essential retail businesses and non-essential but professional businesses are distinguishable from Plaintiff. Plaintiff has failed to demonstrate that it is incapable of practicing its religion or providing spiritual guidance to its members in groups of ten or fewer. Plaintiff has not shown that it is being disparately targeted as compared to more similar gatherings such as birthday parties, book clubs, group fitness classes, secular marriage celebrations, and other similar gatherings, or as compared to non-essential "brick and mortar businesses," which, like churches, "may continue to operate" so long as they limit "all in-person shopping to no more than ten persons per establishment" and only if those ten people can "adhere to . . . social distancing requirements" by staying six feet apart. Executive Order 53, Ex. B to Mot. for TRO, ECF No. 1-3. The Orders have

not been "religiously gerrymandered" to target Plaintiff or other religious organizations.  They strike a balance between saving lives and avoiding societal collapse.  Accordingly, the Governor's Orders are facially neutral.

The "general applicability" prong of this test is also met.  The Governor's Orders are generally applicable because they are not underinclusive.  Plaintiff argues that the Orders are underinclusive because they allow essential businesses to remain open, and because they permit businesses that provide professional services to remain open.  The exceptions pertaining to essential and professional businesses are reasonable and the Orders are not underinclusive, for the reasons provided above.  The exceptions have been carved out for specific reasons to avoid harms equal to or greater than the spread of this deadly pandemic.  Such exemptions are perfectly in keeping with the goal of reducing *to the maximum extent practicable* gatherings of more than ten people.

The Court agrees that practicing one's religion and obtaining spiritual guidance are essential for some people.  Plaintiff is capable of practicing its religion in small-group form, through methods other than physical gathering, and in safe combinations of these options.  The Governor's Orders were developed as a rapid response to an emergency situation; if an "underinclusion" could be identified and presented, that showing would be deemed "inconsequential."  *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 543.  Unlike the ordinance at issue in *Church of the Lukumi Babalu Aye*, the Governor's Orders do not "pursue the [State]'s governmental interests *only* against conduct motivated by religious belief."  *Id.* at 545 (emphasis added).  They were not "gerrymandered with care to proscribe religious" gatherings.  *Id.* at 521.

Rather, the Orders pursue the goal of slowing the spread of a deadly pandemic and saving lives by closing temporarily all places where more than ten people might gather, subject to certain exceptions that are themselves designed carefully to preserve life, health, and livelihood.  The

16

Governor has acted for compelling reasons to grant these exceptions and to deny an exception to Plaintiff and other religious organizations.  *Cf. id.* at 537.

The Governor's Orders are neutral and generally applicable.  The are facially neutral, do not "target" religious establishments, and are not underinclusive.  "The right to practice religion freely does not include liberty to expose the community . . . to communicable disease . . . ill health or death."  *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944).  Plaintiff is unlikely to succeed on this claim.

ii.   The Establishment Clause

Plaintiff also argues that it is likely to succeed on the merits because the Governor's Orders violate the Establishment Clause to the United States Constitution.  Plaintiff is unlikely to succeed on an Establishment Clause claim.

> The Establishment Clause provides that "Congress shall make no law re-specting an establishment of religion . . . ."  In evaluating an Establishment clause claim, [courts] apply the three-prong test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971).  Under this test, to withstand First Amendment scrutiny, government conduct (1) must be driven in part by a *secular purpose*; (2) must have a *primary effect* that neither advances nor inhibits religion; and (3) must not *excessively tangle* church and State.  The government violates the Establishment Clause if the chal-lenged action fails any one of the *Lemon* factors.

*Wood v. Arnold*, 915 F.3d 308, 313–14 (4th Cir. 2019) (citations and second quotation omitted) (emphasis in original) (quoting U.S. Const. amend. I).

"[F]or purposes of an Establishment Clause analysis, context is crucial.  To focus exclu-sively on the religious component of any activity would inevitably lead to the activity's invalida-tion under the Establishment Clause.  Thus, when determining the purpose or primary effect of challenged religious content, courts . . . consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion."  *Id.* (citations,

quotations, and alterations omitted).  The context here is a pandemic of scale and intensity that has not been seen in the United States in more than a century.

The first prong of the *Lemon* test "requires an inquiry into the *subjective intentions* of the government.  This part of the *Lemon* test imposes a fairly low hurdle, requiring the government to show that it had a plausible secular purpose for its action."  *Wood*, 915 F.3d at 315 (quotations omitted).  The Governor's Orders undoubtedly have a plausible secular purpose: slowing the spread of a deadly pandemic and preserving human life.

"To meet the second prong of *Lemon*, the challenged government action must have a primary effect that neither advances nor inhibits religion."  *Id.* at 316 (quotation omitted).  This prong asks "whether, irrespective of government's actual purpose, a reasonable, informed observer would understand that the practice under review in fact conveys a message of endorsement or disapproval of a religion" or of religion generally.  *Id.* (quotation omitted).  The Court "presume[s] that a reasonable observer . . . is aware of the history and context" in which the government's action takes place.  *Id.* (quotation omitted).

Viewing the Governor's Orders in the context of this pandemic, no reasonable observer would believe the Orders disapprove of any particular religion or of religion generally.  The Orders explicitly permit individuals to travel to and from places of worship and permit worship in groups of ten or fewer.  The Orders impose identical restrictions on people who wish to gather for secular purposes such as birthday celebrations, book clubs, viewing art and artistic performances, and exercising (among countless other secular examples).  No reasonable observer would understand the Governor's Orders to disapprove of any particular religion or of religion generally simply because the Orders allow people to enter essential businesses in groups larger than ten to obtain essential goods and services.  Nor would a reasonable observer understand the Orders to be a

disapproval of religion because they allow people to continue working in groups larger than ten in professional businesses that are incapable of operating remotely.  This is particularly true when viewed in the context of alarming and increasing rates of unemployment.  *See* Bureau of Labor Statistics, The Employment Situation – March 2020 (Apr. 3, 2020), https://www.bls.gov/news.re-lease/pdf/empsit.pdf (documenting the impact of the COVID-19 pandemic on unemployment).  A reasonable observer would understand the obvious neutral motivations behind these exceptions.

"The final prong of the *Lemon* test asks whether the government's action created an exces-sive entanglement between government and religion, which is a question of kind and degree.  Ex-cessive entanglement typically involves the government's invasive monitoring of certain activities in order to prevent religious speech . . . ."  *Id.* at 318.  "[S]ome interaction between church and state is inevitable . . . ."  *Koenick v. Felton*, 190 F.3d 259, 268 (4th Cir. 1999).  "The kind of excessive entanglement of government and religion precluded by *Lemon* is characterized by com-prehensive, discriminating, and continuing state surveillance of religious exercise . . . ."  *Lambeth v. Bd. of Comm'rs of Davidson Cty.*, 407 F.3d 266, 273 (4th Cir. 2005) (quoting *Lemon*, 403 U.S. at 619).

The enforcement of the Governor's Orders against a church flagrantly violating the Orders is not reasonably viewed as an "excessive entanglement."  There is no evidence that there has been "invasive monitoring" of Plaintiff or any other religious establishment as compared to other similar gatherings (*i.e.*, birthday parties, book clubs, and fitness classes).  Plaintiff was reasonably advised of the Governor's Orders and then was issued a citation when it disregarded those Orders.  This does not constitute excessive entanglement.

Plaintiff has not made a persuasive showing on any prong of the *Lemon* test.  This claim is unlikely to succeed.

iii.     Freedom of Speech

Plaintiff asserts that it is likely to succeed on the merits because the Governor's Orders violate the First Amendment to the United States Constitution as an unconstitutional restriction on speech. Plaintiff is unlikely to succeed on this claim.

Plaintiff has not identified any speech or expressive conduct being targeted by the Governor's Orders. There is a reasonable limitation on the number of individuals who may gather together at one time. This is not "expressive conduct" protected under the First Amendment.

Although the "First Amendment literally forbids the abridgment only of 'speech,'" the Supreme Court "ha[s] long recognized that its protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Thus, "conduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First Amendment . . . .'" *Id.* (quoting *Spence v. Washington*, 418 U.S. 405, 409 (1974)). But, as the United States Supreme Court has noted, "we cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *Spence*, 418 U.S. at 409 (internal alterations and quotations omitted).

"In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, [courts] ask[] whether an intent to convey a particularized message [is] present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404 (1989) (quotations omitted). The Supreme Court has recognized the following examples as expressive conduct: (1) the wearing of black armbands to protest American military involvement in Vietnam (*see Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 505 (1969)); (2) a sit-in by blacks in a "whites only" area to protest segregation (*see Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966)); picketing (*see United States*

*v. Grace*, 461 U.S. 171, 176 (1983)); attaching a peace sign to the flag (*see Spence*, 418 U.S. at 409–10); and refusing to salute the flag (*see Stromberg v. California*, 283 U.S. 359, 368–369 (1931)).

The conduct targeted by the Governor's Orders is gathering in groups larger than ten. The Court cannot identify an "expressive element" to this conduct, even when narrowed to the conduct of gathering in groups of more than ten at religious institutions. It is unclear what the "particular-ized message" of gathering specifically in groups larger than ten would be, and as the Court cannot discern what the message would be, it is doubtful that the message would be "understood by those who viewed it." *Johnson*, 491 U.S. at 404. The Governor's Orders do not restrict expressive conduct that falls within the protections of the First Amendment's guarantee of freedom of speech.[2]

Moreover, assuming without deciding that the Governor's Orders have an incidental im-pact on some expressive conduct that Plaintiff has insufficiently identified, a different test applies in such circumstances than that asserted by Plaintiff in its Motion. "If the State's regulation is not related to expression, then the less stringent standard [the Supreme Court] announced in *United States v. O'Brien* for regulation of noncommunicative conduct controls." *Id.* at 403. The Supreme Court has held that where the State's regulation is not related to expression but has an incidental impact on expression, it

> is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental re-striction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*United States v. O'Brien*, 391 U.S. 367, 376 (1989).

---

[2] Because gathering in groups of more than ten is not expressive conduct within the meaning of the First Amendment, the Court need not address Plaintiff's argument that the Governor's Orders are a prior restraint on speech.

The Governor's Orders satisfy this test.  The Governor has the power under Article V, Section 7 of the Constitution of Virginia in combination with Virginia Code § 44-146.17 to issue the Orders that are challenged in this case.  The Virginia Constitution provides that "[t]he Governor shall take care that the laws be faithfully executed," and that he "shall have power to . . . enforce the execution of the laws."  Va. Const. art. V, § 7.  Virginia law specifically empowers the Governor to declare a state of emergency and implement mitigation measures in response to a public health threat by a communicable disease.  Va. Code. 44-146.17.

The Orders serve a substantial governmental interest.  The Supreme Court has held that protecting *potential* human life is a compelling governmental interest, and so the preservation of *existing* human life must be a governmental interest of the highest order.  *See Roe v. Wade*, 410 U.S. 113, 162 (1973) (finding that "the State does have an important and legitimate interest . . . in protecting the potentiality of human life" and that "at a point during pregnancy," this interest "becomes 'compelling'").  This interest is unrelated to a person's expression of any idea.  This interest is not speculative.  The novel coronavirus has killed thousands of people in a few months.  *See* Johns Hopkins Medical Center: Coronavirus Resource Center, *COVID-19 Map*, (last visited Apr. 28, 2020), https://coronavirus.jhu.edu/map.html; Josh Katz, Denise Lu, & Margot Sanger, *U.S. Coronavirus Death Toll Is Far Higher Than Reported, C.D.C. Data Suggests*, N.Y. Times (Apr. 28, 2020), https://www.nytimes.com/interactive/2020/04/28/us/coronavirus-death-toll-total.html?action=click&module=Spotlight&pgtype=Homepage.

The scope of the Governor's Orders is no greater than that which is essential to further the interests of slowing the spread of a deadly pandemic and preserving human life.  This requirement "is satisfied so long as the regulation promotes a substantial government interest that would be

achieved less effectively absent the regulation." *Ward v. Rock Against Racism*, 491 U.S. 781, 799

(1989) (quotations and alterations omitted) (describing the *O'Brien* narrow tailoring standard).

The CDC and the President of the United States have advised that people should avoid

gathering in groups of more than ten people. *See* The President's Coronavirus Guidelines for

America*, 30 Days to Slow the Spread* (March 31, 2020), https://www.whitehouse.gov/wp-con-

tent/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x-11_315PM.pdf. The CDC and Presi-

dent have also recommended that "[i]n states with evidence of community transmission, bars, res-

taurants, food courts, gyms, and other indoor and outdoor venues where groups of people congre-

gate should be closed." *Id.* The Governor's Orders follow these guidelines closely. The govern-

mental interest in preserving human life would be achieved less effectively if the Governor were

required to permit more gatherings of groups larger than ten than are absolutely essential. The

Orders are sufficiently narrow to satisfy the *O'Brien* test.

Accordingly, no expressive conduct is at issue in this case. And even if the Governor's

Orders, while not targeting expression, have some incidental impact on expressive conduct, they

are nevertheless permissible under the *O'Brien* test. Plaintiff's claim here is unlikely to succeed.

<u>iv.</u>    <u>The Right to Peaceably Assemble</u>

Plaintiff asserts that it is likely to succeed on its claim that the Governor's Orders violate

its First Amendment right to peaceably assemble. Plaintiff is unlikely to succeed on this claim.

It has long been established that the First Amendment right to peaceably assemble may be

subject to reasonable time, place, and manner restrictions. *See Cox v. New Hampshire.*, 312 U.S.

569, 574–78 (1941). "The rights of free speech and assembly, while fundamental in our demo-

cratic society, still do not mean that everyone with opinions or beliefs to express may address a

group at any . . . place and at any time" and in any manner. *Cox v. Louisiana*, 379 U.S. 536, 554

(1965). "The constitutional guarantee of liberty implies the existence of an organized society maintaining public order," health, and safety. *Id.* One cannot, for example, "insist upon a street meeting in the middle of Times Square at the rush hour as a form of freedom of speech or assembly." *Id.*

Thus, "the government may impose reasonable restrictions on the time, place, or manner of protected speech [and assembly], provided the restrictions are justified without reference to the [expressive or communicative purpose of the regulated assembly], that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information." *Rock Against Racism*, 491 U.S. at 791 (quotation and citations omitted).

The Governor's Orders are content neutral. "Government regulation of expressive activity is content neutral so long as it is *justified* without reference to the content of the regulated speech" or purpose of the regulated assembly. *Id.* (emphasis in original). The Governor's Orders are justified by the need to slow the spread of an extremely contagious and deadly virus. "This justification . . . has nothing to do with content, and it satisfies the requirement that time, place, or manner regulations be content neutral." *Id.* (quotations omitted) (finding regulation at issue to be content neutral because "[t]he principle justification for the sound-amplification guideline is the city's desire to control noise levels at bandshell events").

As noted above, the Governor's Orders serve a significant governmental interest, and are narrowly tailored to serve that interest. *See id.* at 798–99 (noting that "the *O'Brien* test . . . is little, if any, different from the standard applied to time, place, or manner restrictions" and holding that, in the "time, place, or manner" context, "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, context-neutral interest but

it need not be the least restrictive or least intrusive means of doing so.  Rather, the requirement of narrow tailoring is satisfied so long as the regulations promotes a substantial government interest that would be achieved less effectively absent the regulation").  The substantial interest in slowing the spread of this highly contagious virus and saving human life would be achieved less effectively if more people than necessary are permitted to gather in groups larger than ten.

The remaining question, then, is whether the Orders leave open ample alternative channels for communication of the information Plaintiff seeks to express through assembly.  That a regulation "may reduce to some degree the potential audience for [Plaintiff's] speech is of no consequence." *Id.* at 803.  To the extent that gathering in groups of larger than ten has advantages over gathering in groups of ten or fewer, "there is no reason to believe that these same advantages cannot be obtained through other means," such as gathering in groups of ten or fewer multiple times per day or week, mailing letters, sending emails, livestreaming services, posting services on YouTube, Facebook, or other free internet platforms, or deploying some combination of all these methods.  *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 812 (1984).  "[T]here are ample alternative modes of communication" to mass gatherings.  *Id.*  Indeed, the United States Court of Appeals for the Fourth Circuit has found no First Amendment problem with laws restricting the number of individuals who may attend an event.  *See Blasecki v. City of Durham*, 456 F.2d 87, 93 (4th Cir. 1972) ("[W]e think that it is constitutionally permissible for the City of Durham to place a reasonable limit on the number of people who can assemble in Five Points Park.").  Plaintiff's claim that the Governor's Orders violate its right to peaceably assemble is, therefore, unlikely to succeed.

v.      Unconstitutional Discretion

Plaintiff argues that it is likely to succeed on the merits because the Governor's Orders "impermissibly vest County officials with unbridled discretion." Mot. for TRO at 17, ECF No. 3. Plaintiff misconstrues the law on this claim and is unlikely to succeed advancing it.

Generally, "cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech . . . involve[] *licensing schemes* that 'vest unbridled discretion in a government official over whether to permit or deny expressive activity.'" *Rock Against Racism*, 491 U.S. at 793 (alterations omitted) (emphasis added) (quoting *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 755 (1988)). Plaintiff appears to recognize this by asserting that the government may not "condition speech on *obtaining a license or permit* from a government official in that official's boundless discretion." Mot. for TRO at 17, ECF No. 3 (emphasis added). Additionally, all of the cases cited by Plaintiff involve licensing schemes. *See Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (deciding whether an official has unbridled discretion in setting a permit fee for public speaking events, parades, or assemblies); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) (addressing whether newsrack permitting scheme provided mayor with unbridled discretion); *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) (addressing whether municipal board charged with leasing city auditorium had unbridled discretion); *Saia v. People of N.Y.*, 334 U.S. 558, 559–60 (1948) (addressing whether licensing scheme for use of amplification device provided chief of police unfettered discretion); *Am. Entertainers, LLC v. City of Rocky Mount*, 888 F.3d 707, 720 (4th Cir. 2018) (deciding whether a licensing scheme for sexually oriented businesses granted the licensing official unfettered discretion); *Child Evangelism Fellowship of Maryland, Inc. v. Montgomery Cty. Pub. Schs.*, 457 F.3d 376, 386 (4th Cir. 2006) (ruling that school policy requiring school approval of flyers submitted

for distribution to students in take-home packets granted school officials unbridled discretion); *Steakhouse, Inc. v. City of Raleigh*, 166 F.3d 634 (4th Cir. 1999) (involving a special use permit procedure for adult establishments).

As determined above, the Governor's Orders do not constrain expressive conduct. That alone renders this case law inapplicable. Furthermore, the Governor's Orders do not implement a licensing scheme under which officials are tasked with permitting the speech of some and denying the speech of others. There is no "licensor" here. Plaintiff's claim is misplaced.

The Governor's Orders are so clearly outside the bounds of this case law that the argument advancing this claim merits only brief analysis. But even assuming *arguendo* that the Governor's Orders create some sort of licensing scheme, such a scheme would not be one that vests law enforcement with unbridled discretion. "A licensing scheme confers too much discretion on a governmental decisionmaker when it allows the decisionmaker to deny an application based solely on the decisionmaker's own ideas of public welfare, peace, safety, health, decency, good order, morals, or convenience." *Am. Entertainers*, 888 F.3d at 720. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Rock Against Racism*, 491 U.S. at 795. The Governor's Orders provide sufficient guidance to state and local officials regarding what kinds of gatherings are permitted and what kinds of gatherings are prohibited. Plaintiff's claim in this regard will almost certainly fail.

> vi.   Virginia Act for Religious Freedom

Plaintiff argues that it is likely to succeed on the merits of its claim under the Virginia Act for Religious Freedom, which "prohibits the government from 'substantially burden[ing] a person's free exercise of religion even if the burden results from a rule of general applicability unless it demonstrates that application of the burden to the person is (i) essential to further a compelling

governmental interest and (ii) the least restrictive means of furthering that compelling governmental interest.'"  Mot. for TRO at 19, ECF No. 3. (alteration in original) (quoting Va. Code § 57-2.02(B)).  Plaintiff is unlikely to succeed on this claim.

The Governor's Orders are not a "substantial burden" on religious practice.  Under the relevant statute, "'substantially burden' means to inhibit or curtail religiously motivated practice." Va. Code § 57-2.02(A).  Although there is little case law applying or interpreting the Virginia Religious Freedom Act, the statute is not so broad that any incidental burden on a person or group's ability to engage in a religiously motivated practice, no matter how small, is a violation of the statute.  Such an interpretation would call into question many innocuous laws such as occupancy limits, noise ordinances, and building codes.  The proper interpretation is plainly narrower than this.

The Oklahoma Religious Freedom Act identically defines "substantially burden" as "to inhibit or curtail religiously motivated practice."  Okla. Stat. tit. 51 § 252(7).  The Oklahoma state and federal courts have interpreted this to mean that a governmental entity substantially burdens a religiously motivated practice when it: (1) "significantly inhibits or constrains conduct or expression that manifests some central tenant of a person's individual beliefs"; (2) "meaningfully curtails a person's ability to express adherence to his or her faith"; or (3) "denies reasonable opportunities to engage in those activities that are fundamental to a person's religion."  *Griffith v. Caney Valley Pub. Schs.*, No. 15cv273, 2015 WL 2451226 at *5 (N.D. Okla. 2015) (alterations omitted) (quoting *Steele v. Guilfoyle*, 76 P.3d 99, 102 (Okla. Civ. App. 2003)).  "A governmental entity's action does not substantially burden religious activity when it merely has an incidental effect that makes it more difficult to practice the religion."  *Id.*

28

The Court accepts for the purposes of this Motion that Plaintiff has a sincerely held reli-gious belief that requires assembly and group worship.  But Plaintiff is not prohibited from assem-bling altogether, only from assembling in groups of more than ten people.  Plaintiff has not estab-lished a sincerely held religious belief that requires assembly in a group larger than ten.  In fact, the Scripture quoted by Plaintiff in its Motion indicates that the assembly of "two or three" quali-fies as assembly for its religious purposes.  Mot. for TRO at 19, ECF No. 3.

To the extent that Plaintiff's religious practice may be burdened simply because the Gov-ernor's Orders reduce the quantity of people Plaintiff may reach in a given week with its message, Plaintiff has not established why it cannot assemble in groups of ten or fewer more frequently, or by combining small group worship (for those without access to technology) with online worship services (for those with access to technology),[3] thus ultimately reaching a similar number of mem-bers and complying with local, national and international health guidance.

The Orders undoubtedly disrupt normal practice.  There is a global disruption of normal practice.  An incidental disruption of normal practice does not convert the Governor's broadly applicable Orders into a substantial burden on Plaintiff's right to practice its religion.  Plaintiff—and others—may still express adherence to their faith by many alternative means, which plainly includes assembly (albeit with limitations).  The Governor's Orders do not curtail a central tenant of Plaintiff's faith, do not meaningfully curtail Plaintiff's ability to express adherence to its faith,

---

[3] Plaintiff asserts that it "is a small congregation without the resources or equipment to broadcast its worship services online.  Verified Compl. at 4, ECF No. 1.  This is belied somewhat by the fact that Plaintiff maintains a Facebook account.  *See* Lighthouse Fellowship Facebook Account (last accessed Apr. 30, 2020), https://www.facebook.com/pg/LighthouseFellowshipChincoteague/vid-eos/?ref=page_internal.  Facebook account holders may post videos, as Lighthouse has done in the past, and may livestream videos to followers.  Lighthouse clearly has the resources and equipment to broadcast its worship services online.

and do not deny Plaintiff *reasonable* opportunities to engage in those activities fundamental to its faith.

Furthermore, the Virginia Religious Freedom Act explicitly provides that "[n]othing in this section shall prevent any governmental institution or facility from maintaining health, safety, security or discipline."  Va. Code § 57-2.02(E).  The statute does not define "governmental institution," although it does define "governmental entity" to include any branch of government or government official.  Va. Code § 57-2.02(A).  The Court acknowledges that "governmental institution" is subject to both a broad interpretation (to include the Governor's Office as a governmental institution), and a narrow interpretation (*e.g.* correctional or psychiatric institutions).  The broader interpretation is more likely.  The statute already exempts from its provisions "the Department of Corrections, the Department of Juvenile Justice, and any facility of the Department of Behavioral Health and Development that treats civilly committed sexually violent predators, or any local, regional, or federal correctional facility."  Va. Code § 52-2.02(A).  Under a narrower interpretation, subsection (E) would be redundant.  Furthermore, this exception was recommended for inclusion in the statute by the 2007 Governor of Virginia.  *See* Va. Gov. Rec., H.B. 3082 (2007).  This subsection appears to contemplate a situation that is presented now, where the Governor must act swiftly to protect the health and safety of Virginia residents, and such imperative actions might incidentally impact a religiously motivated practice.

Plaintiff has failed to show likelihood of success on this claim.  This is so regardless of whether the Governor's Orders are the least restrictive means of preserving human life during this

deadly pandemic.  Plaintiff cites less restrictive orders of other states as evidence that Virginia has not employed the least restrictive means, but this argument is rejected.[4]

### B.      Balance of the Equities and the Public Interest

Even if Plaintiff were likely to succeed on the merits of some of its claims, its requests for a TRO and preliminary injunction would still be denied.  Plaintiff has not shown that the balance of the equities tips in its favor or that an injunction serves the public interest.

The alleged harms to Plaintiff include the temporary inability to host in-person religious worship services in groups larger than ten.  Assuming *arguendo* that this restriction raises constitutional concerns, "those concerns do not outweigh the severe harm defendant[] would suffer if [the Commonwealth] could not enforce the Executive Order[s]."  *Tolle v. Northam*, No. 1:10cv363, 2020 WL 1955281, at *1 (E.D. Va. Apr. 8, 2020).  Contrary to Plaintiff's assertions, the Commonwealth would be harmed significantly if it were prevented from enforcing the Governor's Orders against religious gatherings of more than ten people.  The Commonwealth has a responsibility to safeguard the lives of its residents.  The Commonwealth has a responsibility to protect frontline healthcare workers from being overwhelmed by more patients than the Virginia health system has the capacity to adequately care for.  Every gathering of more than ten people endangers health and life and increases the burden on the frontline healthcare workers tasked with caring for those afflicted.  An injunction against the enforcement of the Governor's Orders against

---

[4] The Court declines to further address whether the Governor's Orders employ the least restrictive means of slowing the spread of a deadly pandemic and preserving human life, but notes that this may well be the case.  Insufficient evidence exists at this time to evaluate whether those less restrictive orders are equally effective at slowing the spread of the novel coronavirus and saving human life.  Least restrictive cannot mean ineffective.  The orders of these other states—at least one of which has been vigorously criticized for its delayed and ineffectual response to the pandemic—are not nearly as conclusive or persuasive as Plaintiff alleges.

religious gatherings of more than ten interferes substantially with the Commonwealth's ability to meet its responsibilities.

Plaintiff, on the other hand, does not "face an impossible choice" between skipping church services in violation of its sincere religious beliefs or risking criminal citation, as Plaintiff claims. Mot. for TRO at 30, ECF No. 3.  Plaintiff faces the choice between adapting to current circumstances by utilizing a combination of small group worship services multiple times per day and week, broadcasting worship services on its Facebook page, sending emails to members, calling members, making house visits to members, and mailing communications to members, *or* risking arrest by inflexibly continuing on with its usual modes of religious worship.  Although this may not be how Plaintiff wishes to practice its religion under ideal circumstances, these are not ideal circumstances.  The equities, in the context of a deadly pandemic, tip in Defendant's favor.

Even if "the public has a profound interest in [people] worshipping together . . . in a manner consistent with their conscience" (*see id.* at 30), the public has a greater interest in saving human life.  It is no exaggeration to recognize that "the stakes for residents of the Commonwealth are life- or death." *Tolle*, 2020 WL 1955281, at *1.  Enjoining the enforcement of the Governor's Orders to allow Plaintiff and other religious organizations to host gatherings of more than ten people would result in exposing a great number of people in the community to COVID-19 if even one (knowingly or unknowingly) sick person attends a worship service with more than ten people. This is of particular concern in counties like Accomack County, where Plaintiff is located, which has higher rates of infection and morality than many other counties.  *See* Virginia Department of Health, *Covid-19 Cases in Virginia* (last accessed May 1, 2020), https://www.vdh.virginia.gov/coronavirus/ (showing that as of May 1, 2020, Accomack County had a rate of infection

of 935 cases and 15.4 deaths per 100,000 population, higher rates than many other counties in the state).  The public interest weighs against an injunction.

## IV.    CONCLUSION

"[T]he libert[ies] secured by the Constitution of the United States to every person within its jurisdiction does not import an absolute right in each person to be, at all times and in all circumstances, wholly free from restraint.  There are manifold restraints to which every person is necessarily subject for the common good.  On any other basis organized society could not exist with safety to its members."  *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).  The Governor's Orders subject all persons in the State to "manifold restraints."  These restraints have been imposed for the common good to slow the spread of the novel coronavirus and to save the lives of countless people.

Plaintiff is unlikely to succeed on any of its claims.  Even if Plaintiff were likely to succeed on its claims, the balance of the equities and the public interest disfavor preliminary injunctive relief.  Plaintiff therefore fails to meet the requirements for preliminary injunctive relief.  Its Motion for a TRO and Preliminary Injunction (ECF No. 3) is **DENIED**.  The previously set briefing schedule on Plaintiff's Motion is stricken.

The Clerk is **REQUESTED** to forward a copy of this Order to counsel of record for all parties.

**IT IS SO ORDERED.**


                                                              /s/
                                                   Arenda L. Wright Allen
                                                 United States District Judge

May 1, 2020
Norfolk, Virginia