**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

| | |
|---|---|
| LIGHTHOUSE FELLOWSHIP CHURCH, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> RALPH NORTHAM, in his official capacity ) <br> as Governor of the Commonwealth of Virginia, ) <br> ) <br> Defendant. ) <br> ) | Case No. 2:20-cv-00204-AWA-RJK |

**THE UNITED STATES' STATEMENT OF INTEREST IN SUPPORT OF PLAINTIFF'S
MOTION FOR AN INJUNCTION PENDING APPEAL**

The United States respectfully submits this Statement of Interest supporting Plaintiff Lighthouse Fellowship Church's ("Lighthouse"), motion for an injunction pending appeal filed on May 2, 2020. ECF 18. The United States respectfully suggests that the Court erred in its Memorandum Opinion and Order of May 1, 2020, ECF 16, denying Lighthouse's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction, for the reasons below.[1] The Court denied that motion without a hearing, without any briefing from the Commonwealth and without Lighthouse having the opportunity to reply to any justifications offered.

This case, as set forth in detail below, involves important questions of how to balance the deference owed to public officials in addressing a pandemic threatening the health and safety of the public with fundamental constitutional rights. For purposes of this filing, the United States does not take a position on the ultimate question of whether the Commonwealth may have a

---

[1] *See* Fed. R. Civ. P. 62(d); *Personhuballah v. Alcorn*, 155 F. Supp. 3d 552, 558 (E.D. Va. 2016) (following preliminary injunction standards when ruling on a motion for a stay pending appeal).

1

legally sufficient justification for treating Plaintiff differently from non-retail businesses or other permitted assemblies that may be comparable. The Commonwealth has not yet responded to Plaintiff's allegations that it permits non-retail businesses, such as law or accounting offices, to gather in numbers greater than ten so long as they use social distancing. Likewise, the Commonwealth has not yet responded to Plaintiff's allegations that various comparable secular gatherings are permitted. Based on the materials before the Court, Plaintiff has demonstrated a likelihood of success on the merits of its claim under the Free Exercise Clause of the U.S. Constitution that the Commonwealth's executive orders have prohibited religious gatherings at places of worship, even with social distancing and personal hygiene protocols, while allowing comparable secular gatherings to proceed with social distancing. It thus becomes the Commonwealth's burden to demonstrate that it has compelling reasons to treat Plaintiff differently than similar non-religious businesses, and that it has pursued its objectives through the least restrictive means. Because the Commonwealth has not yet filed any response, it has not satisfied its burden.

On May 2, 2020, the United States Court of Appeals for the Sixth Circuit granted an Injunction Pending Appeal in a case raising issues similar to those in this case, *Maryville Baptist Church, Inc. v. Beshear*, No. 20-5427, slip op. (6th Cir. May 2, 2020) (per curiam). The Sixth Circuit there concluded: "[t]he Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same." *Id*. at 8.

Similarly, here, the Commonwealth has not explained why it differentiates and "refus[es] to trust" this small congregation's worship activities that, as alleged, follow social distancing and personal hygiene protocols, while allowing and trusting non-retail businesses to gather more than

ten people in such a fashion. As Plaintiff has made an initial showing that the Commonwealth's executive orders treat religious organizations less favorably than similar secular organizations, and the Commonwealth has not yet carried its strict-scrutiny burden of justifying its differential treatment of religion, the Court should grant Plaintiff's motion and grant an injunction pending appeal.

## INTEREST OF THE UNITED STATES

The United States of America respectfully files this Statement of Interest pursuant to 28 U.S.C. § 517, which authorizes the Attorney General "to attend to the interests of the United States in a suit pending in a court of the United States." The United States also enforces 34 U.S.C. § 12601, which allows the United States to bring suit when law enforcement officers engage in a pattern or practice that deprives individuals of their federal constitutional or statutory rights.

The United States has a substantial interest in the preservation of its citizens' fundamental right to the free exercise of religion, expressly protected by the First Amendment. To that end, the United States regularly files statements of interest and amicus briefs on important issues of religious liberty in courts at every level, from trial courts to the Supreme Court of the United States. In addition, the Attorney General has issued comprehensive guidance interpreting religious-liberty protections available under the United States Constitution and federal law. *Federal Law Protections for Religious Liberty*, 82 Fed. Reg. 49668 (Oct. 26, 2017) ("Attorney General Guidelines"). As relevant here, the Attorney General Guidelines explain that "[a]lthough government generally may subject religious persons and organizations to neutral, generally applicable laws," government cannot "apply such laws in a discriminatory way" or otherwise "target persons or individuals because of their religion." *Id.* at 49669.

The United States also has a strong interest, especially in the midst of the COVID-19 pandemic, in ensuring the development and maintenance of the best possible public health strategies to combat the virus and protect the people of the United States from harm. But that interest must be balanced with constitutional liberties. This case raises issues of national public importance regarding the interplay between the government's compelling interest in protecting public health and safety from COVID-19 and citizens' fundamental right to the free exercise of religion.

## BACKGROUND[2]

This suit was brought by the Lighthouse Fellowship Church in Chincoteague Island, Virginia against Governor Ralph Northam (the "governor" or the "Commonwealth") alleging that the governor has ordered restrictions on gatherings in response to the COVID-19 virus that improperly restrict religious gatherings at places of worship while allowing comparable secular gatherings, including the continued operation of any "business operations offering professional rather than retail services." ECF 1-3, ¶ 8.

Lighthouse "is a small congregation without the resources or equipment to . . . conduct parking lot or drive-in services." ECF 1, ¶ 9. This church has a specialized ministry catering to the socioeconomically disadvantaged. "[M]any of the members it serves are recovering drug addicts, former prostitutes" and others "trying to put their lives together, who do not have the resources to watch worship services over the Internet." *Id.* For "those members, Lighthouse is their only family and assembling with their church family is everything." *Id.*

---

[2] The United States assumes the truth of the facts alleged in the complaint and reflected in the accompanying exhibits for purposes of this brief.

According to the complaint, the Town of Chincoteague Police Department has understood the governor's orders to prohibit Lighthouse from hosting religious services with more than ten people and has enforced these orders against the church. Specifically, the Town of Chincoteague Police Department "imposed criminal sanctions against [its] religious gatherings that included 16 people . . . even though these 16 people were separated by more than six feet in the 225-seat sanctuary." ECF 1, ¶ 2 (emphasis omitted). Indeed, on April 5, 2020, Lighthouse's pastor, Kevin Wilson, was issued a criminal citation and summons because of this sixteen-person worship service. ECF 1, ¶ 8; ECF 1-7. During that service, Lighthouse maintained "social distancing and personal hygiene protocols, including extensive and enhanced sanitizing of common surfaces in Lighthouse's building prior to the service," and "requir[ed] attendees to remain at least six feet apart and use hand sanitizer prior to entering and during movement inside Lighthouse's building." ECF 1, ¶ 54.

Over the last two months, the governor has issued a series of Executive Orders prohibiting religious gatherings of more than ten people, while permitting secular gatherings of more than ten people to occur under an array of circumstances (collectively, the "Orders"). Governor Northam's Executive Order Amended Number Fifty-Three issued on April 15, 2020, bans "all public and private in person gatherings of more than 10 individuals." ECF 1-3, ¶ 1. Executive Order Number Fifty-Five, which Governor Northam issued on March 30, 2020, further specified that prohibited activities "include[] parties, celebrations, *religious*, or other social events." ECF 1-4, ¶ 2 (emphasis added). Violations of the Orders are charged criminally and—according to the Virginia State Police—"can result in an individual[ ] or business being charged with a class one misdemeanor, which carries up to a year in jail and $2,500 fine." ECF 1-5, at 1.

The Orders, however, permit various secular activities resulting in gatherings of more than ten people, so long as "to the extent possible, [they] adhere to social distancing recommendations, enhanced sanitizing practices on common surfaces, and other appropriate workplace guidance from state and federal authorities while in operation." ECF 1-3, ¶ 6.  First, the Orders permit any and all "business operations offering professional rather than retail services [to] remain open," with only an advisory that "they should utilize teleworking as much as possible."  ECF 1-3, ¶ 8; *see also* ECF 1-4, ¶ 2.a (excluding from the ten-person gathering limit any business "not required to close to the public under Executive Order 53").  The Commonwealth publicly confirmed that "[n]othing in the Executive Order impacts business sectors that are not explicitly listed" such that the prohibitions "only cover[] (1) recreation and entertainment businesses, (2) brick and mortar non-essential retail businesses, and (3) restaurants, dining establishments, food courts, breweries, microbreweries, distilleries, wineries, tasting rooms, and farmers markets."[3]  Accordingly, the Orders do not limit the ability of employees of any non-retail business, including but not limited to professional services businesses, to gather.  The Orders impose no limit, for example, on the ability of the workforce to assemble in conference rooms or anywhere else at those worksites.  *See id.*

Second, the Orders contain various exceptions authorizing gatherings of more than ten individuals across an array of "retail businesses," including "[b]eer, wine, and liquor stores," "[h]ome improvement, hardware, building material, and building supply retailers," "[l]aundromats and dry cleaners," and any "department store" that includes a food or pharmacy section.  ECF 1-3, ¶ 5.  Third, all other "brick and mortar retail business[es]" not specifically

---

[3] *See* Virginia's Statewide Stay at Home Order:  Frequently Asked Questions, "I am not a business sector explicitly listed in the Executive Order, but I believe that I am an essential business.  What should I do?," https://www.virginia.gov/coronavirus/faq/.

exempted from the ten-person limit "may continue to operate" if they "limit all in-person shopping to no more than 10 patrons per establishment" with social distancing. *Id.* ¶ 6. The Orders do not impose any numerical caps on the number of staff members who can be present in such retail businesses to service those ten patrons. *See id.*

Lighthouse has submitted photographs reflecting application of these exceptions in practice. For example, some photographs show that various big-box retail stores remain open and are drawing large crowds inside the stores, as evidenced by full parking lots of vehicles. *See* ECF 1, ¶¶ 59-60 (declaration averring that "there were 268 cars in the WalMart parking lot," "156 cars in the Target parking lot," and "162 cars in the parking lot" of Lowe's). A photograph of one of the governor's press conferences shows the use of social distancing in an enclosed space where more than ten people have gathered. *See* ECF 1, ¶ 58.

Lighthouse filed this suit on April 24, 2020, raising claims under, *inter alia*, the Free Exercise Clause of the First Amendment to the United States Constitution. This Court denied Lighthouse's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction on May 1, 2020. ECF 16.

For the reasons set forth below, the United States believes that the church has set forth a strong case that the Orders, by exempting other activities permitting similar opportunities for in-person gatherings of more than ten individuals, while at the same time prohibiting churches from gathering in groups of more than ten—even with social distancing measures and other precautions—has impermissibly interfered with the church's free exercise of religion. Unless the Commonwealth can prove that its disparate treatment of religious gatherings is justified by a compelling reason and is pursued through the least restrictive means, this disparate treatment violates the Free Exercise Clause, and the Orders may not be enforced against the church. This

proof simply has not occurred because the Commonwealth has not yet submitted any argument or evidence in this case.

This is not to say that the Commonwealth must necessarily permit live, indoor church gatherings. As discussed below, there are good reasons to discourage gatherings of more than ten people and to encourage people to stay home whenever possible. But the Free Exercise Clause generally mandates that restrictions on gatherings be applied equally. Thus, an order purportedly aimed at promoting social distancing cannot impose a greater restriction on religious gatherings than similar secular gatherings absent the most compelling, narrowly tailored reasons. It will be difficult for the Commonwealth to justify having one set of rules that allows for secular gatherings—such as in-person operations for any non-retail business and various other exemptions permitting large-scale retail gatherings—while denying to Lighthouse the ability to worship in modest numbers with appropriate social distancing and sanitizing precautions.

## ARGUMENT

### I. Constitutional Rights Are Preserved During a Public Health Crisis

The federal government, the District of Columbia, and all fifty States have declared states of emergency, and have taken unprecedented and essential steps to contain the spread of the novel coronavirus and the consequences of the life-threatening COVID-19 pandemic.[4] The President issued "Coronavirus Guidelines for America," which, among other measures, urge the public to "follow the directions of [their] state and local authorities," to "avoid social gatherings in groups of more than 10 people" and to "use drive-thru, pickup, or

---

[4] *See*, *e.g.*, Presidential Proclamation, Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.

delivery options" instead of "eating or drinking at bars, restaurants, and food courts."[5] The Centers for Disease Control and Prevention recommended that individuals "[s]tay at home as much as possible" and when in public keep "about 6 feet" away from others.[6] States and localities, in turn, imposed a variety of measures, including mandatory limitations on gatherings. And more recently, President Trump also "unveiled Guidelines for Opening Up America Again, a three-phased approach based on the advice of public health experts" to "help state and local officials when reopening their economies, getting people back to work, and continuing to protect American lives."[7] Following these guidelines is the best path to swiftly ending COVID-19's profound disruptions to our national life and resuming the normal economic life of our country. Citizens who seek to do otherwise are not merely assuming risk with respect to themselves, but are exposing others to the same danger. Accordingly, state and local governments, seeking to protect the public health, are restricting in-person assemblies, including religious assemblies.

Moreover, the Constitution does not hobble government from taking necessary, temporary measures to meet a genuine emergency. According to the Supreme Court, "in every well-ordered society charged with the duty of conserving the safety of its members the rights of the individual in respect of his liberty may at times, under the pressure of great dangers, be subjected to such restraint, to be enforced by reasonable regulations, as the safety of the general public may demand." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S.

---

[5] The President's Coronavirus Guidelines for America (Mar. 16, 2020), https://www.whitehouse.gov/wp-content/uploads/2020/03/03.16.20_coronavirus-guidance_8.5x11_315PM.pdf.

[6] Centers for Disease Control and Prevention, How to Protect Yourself and Others (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

[7] Guidelines: Opening Up America Again (April 16, 2020), https://www.whitehouse.gov/openingamerica/.

11, 29 (1905). In *Jacobson*, for example, the Court explained that "[a]n American citizen arriving at an American port" who had traveled to a region with yellow fever "may yet, in some circumstances, be held in quarantine against his will." *Id.* The "settled rule [from *Jacobson*]," a court of appeals recently noted, "allows the state to restrict, for example, one's right to peaceably assemble, to publicly worship, to travel, and even to leave one's home." *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020). And, critically, "[t]he right to practice religion freely does not include the liberty to expose the community . . . to communicable disease." *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944). Emergency public health measures such as gathering limitations and social distancing requirements in response to COVID-19 are evaluated under the Supreme Court's decision in *Jacobson.* Courts owe substantial deference to government actions, particularly when exercised by states and localities under their police powers during a bona fide emergency.

But there is no pandemic exception to the Constitution and its Bill of Rights. Indeed, "individual rights secured by the Constitution do not disappear during a public health crisis." *In re Abbott*, 954 F.3d at 784. These individual rights, including the protections in the Bill of Rights made applicable to the states through the Fourteenth Amendment, are always operative and restrain government action. Accordingly, the Supreme Court has instructed courts to intervene "if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, *beyond all question*, *a plain, palpable invasion of rights secured by the fundamental law*." *Jacobson*, 197 U.S. at 31 (emphasis added). Thus, if the record establishes a "plain, palpable" violation of constitutional rights, then a court must grant relief. *See In re Abbott*, 954 F.3d at 784. Courts reviewing measures designed to address the "society-threatening epidemic" of COVID-19 should

be vigilant to protect against clear invasions of constitutional rights while ensuring they do "not second-guess the wisdom or efficacy of the measures" properly enacted by the democratic branches of government, on the advice of public health experts. *Id.* at 784-85.

## II. The Free Exercise Clause Prohibits Unequal Treatment of Religious Individuals and Organizations

**A.** The Free Exercise Clause guarantees to all Americans the "right to believe and profess whatever religious doctrine [they] desire[]." *Emp't Div. v. Smith*, 494 U.S. 872, 877 (1990). It also protects their right to act on these beliefs, through gathering for public worship as in this case, or through other acts of religious exercise in their daily lives. While the protections for actions based on one's religion are not absolute, *id.* at 878-79, among the most basic requirements of the Free Exercise Clause are that government may not restrict "acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display," *id.* at 877, nor "target the religious for special disabilities based on their religious status," *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) (citation and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. To determine whether a law impermissibly targets religious believers or their practices, the Supreme Court has directed courts to "survey meticulously" the text and operation of a challenged law to ensure that it is neutral and of general applicability. *Church of the Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 534 (1993). The Court explained: "The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 543; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

Under the Free Exercise Clause, a law or rule, or the application of a law or rule, that is not both neutral and generally applicable is subject to heightened scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 531.

A law or rule is not neutral if it singles out particular religious conduct for adverse treatment; treats the same conduct as lawful when undertaken for secular reasons but unlawful when undertaken for religious reasons; "visits gratuitous restrictions on religious conduct"; or "accomplishes . . . a religious gerrymander, an impermissible attempt to target [certain individuals] and their religious practices." *Id.* at 533-35, 538 (citations and internal quotation marks omitted); *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672.

A law is not generally applicable if "in a selective manner [it] impose[s] burdens only on conduct motivated by religious belief," including by "fail[ing] to prohibit nonreligious conduct that endangers [its] interests in a similar or greater degree than does" the prohibited conduct. *Church of the Lukumi Babalu Aye*, 508 U.S. at 534; *see also* Attorney General Guidelines, 82 Fed. Reg. at 49672. In *Church of the Lukumi Babalu Aye*, the Court found that the challenged ordinances were "underinclusive with regard to the [government's] interest in public health" because they outlawed the religious conduct at issue but failed to prohibit various nonreligious conduct that had an equal or greater impact on public health. 508 U.S. at 543-45. The ordinances were thus not generally applicable. *Id.*

"A law is underinclusive, and thus not generally applicable, when it fails to prohibit secular activity that endangers the same interests to a similar or greater degree than the prohibited religious conduct." *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *6 (D. Kan. Apr. 18, 2020); *accord Central Rabbinical Congress of U.S. & Canada v. New York Dep't of Health*, 763 F.3d 183, 197 (2d Cir. 2014) (A law is not generally applicable

if it "is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it."); *Ward v. Polite*, 667 F.3d 727, 738 (6th Cir. 2012) ("If the law appears to be neutral and generally applicable on its face, but in practice is riddled with exemptions . . . the law satisfies the First Amendment only if it 'advance[s] interests of the highest order and [is] narrowly tailored in pursuit of those interests.'" (citation omitted)); *see also Church of the Lukumi Babalu Aye*, 508 U.S. at 534 & 538; Attorney General Guidelines, 82 Fed. Reg. at 49672.

A "prohibition that society is prepared to impose upon [religious] worshippers but not upon itself," the Supreme Court held, is not generally applicable and is subject to strict scrutiny. *Church of the Lukumi Babalu Aye*, 508 U.S. at 545 (citation omitted); *see also American Life League, Inc. v. Reno*, 47 F.3d 642, 654 (4th Cir. 1995) (recognizing that a law would not be generally applicable if the same conduct is not "outlawed for all," or if a violation under a law depended on "whether a violator acts on the basis of religious conviction or temporal views").

Accordingly, the Supreme Court's Free Exercise Clause decisions instruct this Court to "survey meticulously," *Church of the Lukumi Babalu Aye*, 508 U.S. at 534, the risks and character of the various activities the state chooses to permit. "All laws are selective to some extent, but categories of selection are of paramount concern when a law has the incidental effect of burdening religious practice. The Free Exercise Clause protect[s] religious observers against unequal treatment." *See id.* at 542 (internal citation omitted).

Here, the Court must determine whether the Commonwealth's distinctions between religious and secular gatherings are truly neutral and generally applicable. In other words, the

Court must ensure that like things are treated as like, and that religious gatherings are not singled out for unequal treatment.

If the Court determines that the Orders fail to prohibit secular activities comparable to Lighthouse's gathering of more than ten individuals, then the Court must review the Commonwealth's purported justifications and determine if they meet strict scrutiny, *i.e.*, whether the Commonwealth has demonstrated a compelling governmental interest, pursued through the least restrictive means. *See id.* at 546 ("The compelling interest standard that we apply . . . is not 'water[ed] . . . down' but 'really means what it says.'" (internal citation omitted)); *see also Jesus Christ Is The Answer Ministries, Inc. v. Baltimore County, Md.*, 915 F.3d 256 (4th Cir. 2019) ("A government decision fails strict scrutiny if it is not narrowly tailored to advance a compelling state interest.").

The Court must be appropriately deferential to the expertise of public health officials in evaluating potential distinctions between secular gatherings listed in the Orders and religious gatherings. *See Jacobson*, 197 U.S. at 31; *In re Abbott*, 954 F.3d at 784-85. But such deference will not justify action that is "beyond all question, a plain, palpable" violation of free exercise principles. *Jacobson*, 197 U.S. at 31; *see also In re Abbott*, 954 F.3d at 784-85. Thus, if the Court determines that the Orders plainly are not neutral and generally applicable, then the Court may sustain their disparate treatment of religious gatherings only if it meets the demands of strict scrutiny.

**B.** In prohibiting church services or other religious gatherings that exceed ten people, despite permitting various other gatherings that may result from secular activities, the Commonwealth's Orders appear, at least, not to be generally applicable.

The Orders' exemption of all non-retail businesses, including professional services, from the mass-gathering limit, is not generally applicable. Under this exemption, a large law firm, real estate firm, or any other non-retail business, such as a production facility, is free to operate using its entire workforce, without any limits on the size of meetings or any prohibitions on gathering in conference rooms or any other part of these offices. As the Supreme Court made clear in *Church of the Lukumi Babalu Aye,* a "prohibition that society is prepared to impose upon [religious worshippers] but not upon itself," is not generally applicable. 508 U.S. at 545 (citation omitted). Or as then-Judge Alito explained, "[a] law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004). And this is what the Sixth Circuit held recently in *Maryville Baptist Church, Inc. v. Beshear*, No. 20-5427, slip op. (6th Cir. May 2, 2020) (per curiam). The Sixth Circuit determined that because "[t]he Governor has offered no good reason so far for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same," *id.* at 8, a rule was not generally applicable under *Church of the Lukumi Babalu Aye* and strict scrutiny applied. *Id.* at 6, 8.

The inconsistent treatment in the Orders of conduct that appears to endanger the Commonwealth's interest to a similar degree to permitted activities shows, on this record, that the Commonwealth has not acted in a generally applicable manner.[8] It is thus incumbent on the

---

[8] Because the Orders are not generally applicable, strict scrutiny applies, and the Court need not reach the issue of whether the Orders are neutral toward religion. The United States notes, however, that "[n]eutrality and general applicability are interrelated, and . . . failure to satisfy one

Commonwealth to show how it is in fact not treating Lighthouse in a disparate manner. It is not possible for the Commonwealth to do so on this record because it has not yet responded to the motion for a TRO or preliminary injunction. Likewise, Lighthouse has made at least an initial showing of irreparable injury. *See Stuart Circle Parish v. Board of Zoning Appeals of City of Richmond*, 946 F. Supp. 1225, 1235 (E.D. Va. 1996) (recognizing that "plaintiffs will suffer irreparable injury [where] they will be prevented from practicing the free exercise of their religion"). And the Commonwealth has not come forward with any reasons why the equities and public interest would weigh against Plaintiff's proposed gatherings, which, as alleged, serve an essential function for its congregants while complying with all social distancing and sanitation guidelines. Thus, on this record, a preliminary injunction should have issued and an injunction pending appeal is warranted.

**C.** The United States does not take a position in this Statement on the advisability of in-person gatherings in Virginia or in any of its localities at this time, as the proper response to the COVID-19 pandemic will vary over time depending on facts on the ground. But the Commonwealth cannot treat religious gatherings less favorably than other similar, secular gatherings. To be clear, this principle does not prevent a government from seeking to establish "that mass gatherings at churches [of the sort Lighthouse proposes] pose unique health risks that

---

requirement is a likely indication that the other has not been satisfied." *Church of the Lukumi Babalu Aye*, 508 U.S. at 531. The value judgment inherent in providing exemptions for secular activities that impact the Commonwealth's interests while not providing exemptions for Plaintiff's religious activities tends to indicate that the Commonwealth's actions may not be religion-neutral. *See Fraternal Order of Police v. Newark*, 170 F.3d 359, 365 (1999) (Alito, J.) ("[I]n *Smith* and *Lukumi,* it is clear . . . the Court's concern was the prospect of the government's deciding that secular motivations are more important than religious motivations"); *id.* at 366 (heightened scrutiny attaches when government "makes a value judgement in favor of secular motivations, but not religious motivations").

do not arise" in the context of the activities that the Orders permit. *First Baptist Church*, 2020 WL 1910021 at *7; *see infra* Part III. As discussed in Part III, however, the Commonwealth has not yet asserted any such carefully tailored approach, and Lighthouse would be entitled to relief unless the Commonwealth can carry its burden on strict scrutiny. *See, e.g.*, *id.* at *3 & 7 (holding that "secular facilities that are still exempt from the mass gathering prohibition or that are given more lenient treatment," including "airports, childcare locations, hotels, food pantries and shelters, detoxification centers," "shopping malls," and "office spaces," demonstrated religious targeting that failed strict scrutiny and called for a temporary restraining order against the Kansas Governor's COVID-19 Order).

**III.     The Compelling Interest / Least Restrictive Means Test Is a Searching Inquiry**

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. To satisfy the commands of the First Amendment, a law restrictive of religious practice must advance "'interests of the highest order'" and must be narrowly tailored in pursuit of those interests. *Church of the Lukumi Babalu Aye*, 508 U.S. at 546. "The compelling interest standard that we apply . . . is not 'water[ed] . . . down' but 'really means what it says.'" *Id*; *see also Axson-Flynn*, 356 F.3d at 1294 (Where a law or rule is not neutral and generally applicable, defendants "face the daunting task of establishing that the requirement was narrowly tailored to advance a compelling governmental interest."). This is a difficult standard for the Commonwealth to meet.

As a general matter, prohibiting large gatherings to slow the spread of COVID-19 undeniably advances a compelling government interest. The Fifth Circuit has recently recognized "the escalating spread of COVID-19, and the state's critical interest in protecting the public health." *In re Abbott*, 954 F.3d at 778. Moreover, the Supreme Court has noted that

"'context matters' in applying the compelling interest test, and has emphasized that strict scrutiny's fundamental purpose is to take 'relevant differences' into account." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006). For example, in *Cutter v. Wilkinson*, the Supreme Court applied the compelling interest standard in a manner that directed that prison administrators be afforded deference on what constitutes safety and good order. 544 U.S. 709, 723 (2005). Similarly, here, a court must apply this standard in the context of the pandemic.

However, that is not the end of the inquiry. In *O Centro*, the Supreme Court considered under the federal RFRA whether banning a religious group from using a particular controlled substance in its worship service was supported by the compelling interest of enforcing the drug laws. *See O Centro*, 546 U.S. at 428-39. The Court recognized that while enforcing the drug laws undoubtedly constitutes a compelling interest as a general matter, the government had to show more: a compelling interest in applying those laws to the small religious group that sought to use a drug in religious ceremonies that was not a sought-after recreational drug and thus not prone to diversion. Drawing on its Free Exercise Clause precedents, the Supreme Court held that courts must look "beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[ ] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. And given that "a law cannot be regarded as protecting an interest of the highest order . . . when it leaves appreciable damage to that supposedly vital interest unprohibited," the existence of other exemptions for similar conduct will be relevant in determining whether denying the desired religious exemption survives strict scrutiny. *Id.* at 433.

Because a compelling interest must be evaluated in context rather than by reference to a broad general principle such as health or safety, and because the "least-restrictive-means standard is exceptionally demanding," *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014), a court must engage in a searching inquiry.

The ultimate question for this Court, then, is whether the Commonwealth's prohibition on in-person religious worship exceeding ten people to Lighthouse's sixteen-person gathering—while exempting all non-retail businesses and others from the ten-person limit—furthers a compelling interest, and whether there is no less restrictive measure the Commonwealth could use to achieve that interest while allowing the church to hold its services. If, in this fact-intensive and context-laden analysis, the Court determines that there are no "relevant differences," *O Centro*, 546 U.S. at 431-32, with regard to efficacy in slowing the spread of COVID-19, between allowing the church to meet as proposed and allowing these various preferred gatherings, then the Commonwealth's Orders must yield to the church's sincerely held religious exercise. At this stage of the case, where the Commonwealth has yet to respond, it is not possible to reach that conclusion.

## CONCLUSION

The United States respectfully requests that the Court consider these arguments in deciding the Plaintiff's Motion for an Injunction Pending Appeal. The facts on this record show that the Commonwealth has imposed limits on religious activity it has not imposed on comparable secular activities. If proven, the facts alleged in Lighthouse's complaint would thus establish a Free Exercise violation unless the Commonwealth demonstrates that its actions satisfy the demanding strict scrutiny standard. The Commonwealth has not yet filed its response and has introduced no evidence. It therefore has not satisfied its burden. Accordingly, based on this

Court's decision to deny the motion for a preliminary injunction at this stage, the United States respectfully requests that the Court either grant the Injunction Pending Appeal, or in the alternative, hold a hearing on Plaintiff's motion to ensure that Defendant's responses can be evaluated.

Dated: May 3, 2020

        Respectfully submitted,

        ERIC S. DREIBAND
        Assistant Attorney General

        G. ZACHARY TERWILLIGER
        United States Attorney

        ALEXANDER V. MAUGERI
        Deputy Assistant Attorney General

        ELLIOTT M. DAVIS
        ERIC W. TREENE
        Special Counsels

        */s/ Jennifer E. Flurry*
        Jennifer E. Flurry, VSB No. 80149
        Office of the United States Attorney
        101 West Main Street, Suite 8000
        Norfolk, Virginia 23510
        Telephone: (757) 441-3160
        Facsimile: (757) 441-6689
        Email: jennifer.flurry@usdoj.gov

        *Counsel for the United States of America*