IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

| | | |
|---|---|---|
| LIGHTHOUSE FELLOWSHIP CHURCH, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:20-cv-00204-AWA-RJK |
| | ) | |
| v. | ) | |
| | ) | |
| RALPH NORTHAM, GOVERNOR, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR INJUNCTION PENDING APPEAL AND
<u>RESPONSE TO UNITED STATES'S STATEMENT OF INTEREST</u>**

Mark R. Herring
*Attorney General*

Erin B. Ashwell (VSB No. 79538)
*Chief Deputy Attorney General*

Victoria N. Pearson (VSB No. 48648)
Samuel T. Towell (VSB No. 71512)
*Deputy Attorneys General*

Jacqueline C. Hedblom (VSB No. 68234)
*Assistant Attorney General*

Toby J. Heytens (VSB No. 90788)
*Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
*Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 94542)
*Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
*John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................................ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT ............................................................................................................................ 2

LEGAL STANDARD............................................................................................................... 8

ARGUMENT ............................................................................................................................ 9

    I.    This Court lacks authority to issue the requested injunction against the Governor ...........9

        A.    Lighthouse's federal claims are barred by the Eleventh Amendment......................10

        B.    The Eleventh Amendment bars this Court from enjoining the Governor based on alleged violations of the Virginia Act for Religious Freedom.............................13

        C.    Lighthouse lacks standing to raise either its federal or state claims because the temporary gatherings restriction applies to *individuals*, not entities ........................13

    II.    Lighthouse's claims are unlikely to succeed on the merits ...............................................16

        A.    The temporary gatherings restriction is a good-faith, evidence-based emergency measure deserving of this Court's deference .........................................16

        B.    Lighthouse's various First Amendment challenges would likely fail even under the standards applicable to non-emergency measures ...................................17

            1.    The Free Exercise Clause ....................................................................... 18

            2.    The Establishment Clause ....................................................................... 24

            3.    The Free Speech and Assembly Clauses ............................................... 25

        C.    Lighthouse's state law challenge would likely fail even under the standards applicable to non-emergency measures ...................................................28

    III.    The balance of equities and public interest factors independently foreclose injunctive relief....................................................................................29

CONCLUSION........................................................................................................................ 30

CERTIFICATE OF SERVICE ............................................................................................... 32

# TABLE OF AUTHORITIES

Page

**Cases**

*A Helping Hand, LLC v. Baltimore Cty*,
  515 F.3d 356 (4th Cir. 2008) ............................................................. 14

*Allen v. Cooper*,
  895 F.3d 337 (4th Cir. 2018) ............................................................. 11

*Allen v. Wright*,
  468 U.S. 737 (1984) ......................................................................... 14

*American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*,
  888 F.3d 707 (4th Cir. 2018) ......................................................... 26, 27

*Bethel World Outreach Ministries v. Montgomery Cty. Council*,
  706 F.3d 548 (4th Cir. 2013) ............................................................. 16

*Bishop v. Bartlett*,
  575 F.3d 419 (4th Cir. 2009) ............................................................. 13

*Capital Associated Indus., Inc. v. Stein*,
  922 F.3d 198 (4th Cir. 2019) ............................................................. 23

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993) ..................................................................... 18, 20

*Employment Div., Dep't of Human Res. of Oregon v. Smith*,
  494 U.S. 872 (1990) ......................................................................... 18

*Ex parte Young*,
  209 U.S. 123 (1908) ................................................................... passim

*First Baptist Church v. Kelly*,
  No. 20-1102-JWB, 2020 WL 1910021 (D. Kan. Apr. 18, 2020) ................. 24

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002) ......................................................... 25, 26

*Hall v. Northam*,
  No. CL2000632-00 (Culpeper Cir. Ct. April 30, 2020) .......................... 17

*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*,
  193 F. Supp. 3d 556 (E.D. Va. 2016) ................................................... 8

*Harris v. McDonnell*,
  988 F. Supp. 2d 603 (W.D. Va. 2013) ................................................ 11

*Hunt v. Washington State Apple Advert. Comm'n*,
  432 U.S. 333 (1977) ......................................................................... 15

*In re Abbott,*
    No. 20-50296, 2020 WL 1911216 (5th Cir. Apr. 20, 2020) .................................................... 13

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ............................................................................................................... 17

*Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cty.,*
    915 F.3d 256 (4th Cir. 2019) ............................................................................................... 23

*Kobe v. Haley,*
    666 Fed. Appx. 281 (4th Cir. 2016) .................................................................................... 11

*Kowalski v. Tesmer,*
    543 U.S. 125 (2004) ............................................................................................................. 15

*Lemon v. Kurtzman,*
    403 U.S. 602 (1971) ............................................................................................................. 24

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................................................. 14

*Lytle v. Griffith,*
    240 F.3d 404 (4th Cir. 2001) ............................................................................................... 10

*Maryville Baptist Church, Inc. v. Beshear,*
    No. 20-5427 (6th Cir. May 2, 2020) .................................................................................... 29

*McBurney v. Cuccinelli,*
    616 F.3d 393 (4th Cir. 2010) ......................................................................................... 10, 12

*Moore v. City of Asheville,*
    396 F.3d 385 (4th Cir. 2005) ............................................................................................... 15

*North Carolina State Conference of NAACP v. Cooper,*
    397 F. Supp. 3d 786 (M.D. N.C. 2019) ............................................................................... 11

*On Fire Christian Center, Inc. v. Fischer,*
    No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. April 11, 2020) ................................ 29

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................................................................................ 9, 13

*Police Dep't of City of Chicago v. Mosley,*
    408 U.S. 92 (1972) ............................................................................................................... 26

*Ross v. Early,*
    746 F.3d 546 (4th Cir. 2014) ............................................................................................... 27

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995) ......................................................................................................... 24, 26

*Rucho v. Common Cause,*
    139 S. Ct. 2484 (2019) ......................................................................................................... 16

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,*
    549 U.S. 422 (2007) ............................................................................................................. 15

*Smith v. Avino,*
  91 F.3d 105 (11th Cir. 1996) .................................................................... 17

*South Carolina Wildlife Fed. v. Limehouse,*
  549 F.3d 324 (4th Cir. 2008) .................................................................... 11

*Spokeo, Inc. v. Robins,*
  136 S. Ct. 1540 (2016) ............................................................................. 14

*Suarez Corp. Indus. v. McGraw,*
  125 F.3d 222 (4th Cir. 1997) .................................................................... 13

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
  566 U.S. 560 (2012) ................................................................................. 21

*Taylor v. Freeman,*
  34 F.3d 266 (4th Cir. 1994) ....................................................................... 9

*Tony Alamo Christian Ministries v. Selig,*
  664 F.3d 1245 (8th Cir. 2012) .................................................................. 15

*United States v. Chalk,*
  441 F.2d 1277 (4th Cir. 1971) ............................................................ 16, 17

*United States v. O'Brien,*
  391 U.S. 367 (1989) ................................................................................. 25

*Virginia Uranium, Inc. v. McAuliffe,*
  147 F. Supp. 3d 462 (W.D. Va. 2015) ...................................................... 11

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ............................................................................ 25, 27

*Waste Management Holdings, Inc. v. Gilmore,*
  252 F.3d 316 (4th Cir. 2001) .............................................................. 10, 11

*White's Place, Inc. v. Glover,*
  222 F.3d 1327 (11th Cir. 2000) ................................................................ 14

*Will v. Michigan Dep't of State Police,*
  491 U.S. 58 (1989) ................................................................................... 10

*Winter v. NRDC,*
  555 U.S. 7 (2008) ................................................................... 1, 8, 28, 29

*Workman v. Mingo Cty. Bd. of Educ.,*
  419 Fed. Appx. 348 (4th Cir. 2011) ..................................................... 24, 26

*Wright v. North Carolina,*
  787 F.3d 256 (4th Cir. 2015) .................................................................... 10

*Younger v. Harris,*
  401 U.S. 37 (1971) ................................................................................... 15

## Constitutional Provisions

U.S. Const. amend. I ................................................................................ passim

U.S. Const. amend. XI ................................................................................ 9, 10, 13, 16

U.S. Const. art. IV, § 4 .......................................................................................... 9, 16

**Statutes**

42 U.S.C. § 2000cc *et seq.* ........................................................................................ 9

42 U.S.C. § 2000cc(a)(1) ........................................................................................ 16

Va. Code Ann. § 15.2-1627 ..................................................................................... 12

Va. Code Ann. § 44-146.17(1) .................................................................................. 12

Va. Code Ann. § 57-1 *et seq.* ................................................................................. 16

Va. Code Ann. § 57-2.02 .................................................................................... 28, 29

Va. Code Ann. § 57-2.02(b) .................................................................................... 28

Va. Code Ann. § 57-2.02(e) ............................................................................... 28, 29

**Rules**

Fed. R. Civ. P. 62(d) ........................................................................................... 8, 30

**Other Authorities**

Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Protect Yourself* .......... 3

Council of State Gov'ts, COVID-19 Resources for State Leaders ................................................ 3

Erin Ailworth & Alexandra Berzon, *How Coronavirus Invaded One New York Community: 'We Weren't Expecting It to Be Ground Zero,'* Wall St. J. (Mar. 30, 2020) ...................................... 4

Fenit Nirappil, *D.C.'s Patient Zero: A Priest's Journey from ICU to Reuniting with Family and Flock*, Wash. Post (Mar. 30, 2020) ............................................................................. 3

Henry Graff & Brent Solomon, *Northam: Virginia Set to Begin Reopening Plan May 15*, WWBT (May 4, 2020) ...................................................................................................... 7

Jeremy Lazarus, *Revival Linked to COVID-19*, Richmond Free Press (Apr. 30, 2020) ................ 4

Jonathan Shorman, *Kansas Has 3 Church-Related COVID-19 Clusters, State Says Amid Scramble for Supplies*, Wichita Eagle (Apr. 6, 2020) ................................................................ 3

Matt Chittum, *From Livestreamed Services to Drive-in Worship, Faith Communities Find Their Way Amid Pandemic*, Roanoke Times (Apr. 4, 2020) ...................................................... 6

Michelle Boorstein, *Prominent Virginia Pastor Who Said 'God Is Larger Than This Dreaded Virus' Dies of Covid-19*, Wash. Post (Apr. 13, 2020) .................................................... 4

Scott Wilson et al., *Coronavirus Creates Conflict for Churches, Where Gatherings Can Be Dangerous but Also Provide Solace*, Wash. Post (Apr. 5, 2020) ......................................... 3

Sharon Otterman & Sarah Maslin Nir, *New Rochelle, Once a Coronavirus Hot Spot, May Now Offer Hope*, N.Y. Times (Mar. 27, 2020) ................................................................... 4

Virginia Dep't of Health, *COVID-19 Cases in Virginia* ............................................................ 2

William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020).............................................................................. 17

**INTRODUCTION**

The COVID-19 pandemic has raised extraordinarily difficult questions for elected officials and policymakers. The virus is deadly and spreads with devastating ease. Well-intentioned people can infect others without realizing they carry the virus. There is no proven treatment or vaccine. Millions have been infected and hundreds of thousands have already died.

Faced with a dire threat, Governor Ralph Northam has had to make difficult decisions to slow the disease's spread, protect public health, and save lives. Among those decisions is the one challenged here: a temporary prohibition on in-person gatherings of more than 10 people.

The Governor recognizes that the restrictions imposed to fight the spread of COVID-19 have been hard on all Virginians, including religious communities, and he is committed to easing them as soon as it is safe to do so. But Virginia's restrictions do not operate in the way plaintiff and the Federal Government claim, nor has religion been singled out for unfair treatment. To the contrary, the Governor has issued guidance specifically designed to help religious communities maintain their communion and worked with religious leaders to find creative solutions to the challenges of this moment.

Plaintiff claims the Governor has not gone far enough in protecting religious liberty and seeks to enjoin the temporary gatherings restriction "to the extent [it] prohibits religious worship services at Lighthouse, or in-person church services at Lighthouse." Compl. 45. But this Court lacks authority to issue the injunction plaintiff seeks, and such a ruling would seriously undermine Virginia's efforts to resist a once-in-a-century pandemic and threaten irreparable harm to an unknown (and unknowable) number of people. Neither the United States Constitution nor the Code of Virginia requires that result, and plaintiff fails to demonstrate its entitlement to the "extraordinary remedy" it seeks. *Winter v. NRDC*, 555 U.S. 7, 20, 24 (2008).

**STATEMENT**

1.      In January, Chinese authorities announced a novel coronavirus was likely to blame for a mysterious, pneumonia-like illness. Decl. of M. Norman Oliver ¶ 4 (attached as Exhibit 1). Months later, COVID-19 has become a pandemic, killing more than 250,000 and infecting more than 3.6 million worldwide. ¶ 9. Virginia's death toll stands at 713—a number that continues to climb. ¶ 14. More than 20,000 COVID-19 cases have been reported in the Commonwealth, including over 5,000 new cases last week alone. ¶ 13. And because of limitations in testing capacity, these figures "likely undercount[] the actual number of positive cases." *Id.*

Accomack County, where plaintiff is located, has been hit particularly hard. With a population of less than 33,000, Accomack's 463 cases and 7 deaths represent the second highest case count per 100,000 residents anywhere in the Commonwealth. Indeed, Accomack has more COVID-19 cases than thirteen-times-larger Virginia Beach.[1]

In Accomack and elsewhere, the toll of COVID-19 extends beyond the infected. As COVID-19 patients require treatment and hospitalization, the burden on the healthcare system grows. Oliver Decl. ¶¶ 15, 20, 25. Depending on the speed of infection, Virginia could face a shortage of hospital beds, intensive-care-unit beds, and ventilators. ¶ 15. Such shortages would place healthcare workers at even higher risk and prevent those needing treatment for unrelated reasons from accessing care. *Id.*

2.      One thing that makes COVID-19 so deadly is the ease with which it spreads. The virus is transferred by in-person interactions, either between people in close contact or through respiratory droplets when an infected person coughs, sneezes, or talks. Oliver Decl. ¶ 6.

---

[1] Virginia Department of Health, *COVID-19 Cases in Virginia*, https://www.vdh.virginia.gov/coronavirus/ (last visited May 7, 2020).

Evidence also suggests the virus can survive "for hours if not days" on surfaces such as plastic and metal. ¶ 23. And infected persons may not show symptoms—and thus may not realize they have contracted the virus—for days, if at all. ¶ 6.

3.      Lacking a vaccine or cure, officials have focused on slowing COVID-19's spread. According to federal guidance, "[e]veryone should . . . [a]void close contact" by "not gather[ing] in groups" and "[p]ut[ting] distance between yourself and other people."[2] State officials have implemented that guidance by closing schools, requiring many businesses to close to the public, prohibiting gatherings of more than 10 people, and issuing stay-at-home orders.[3]

Time and again, large gatherings—including in-person religious services—have provided fertile ground for transmitting this deadly virus. Throughout the United States, "[c]hurches, temples and other places of worship" have "exacerat[ed] outbreaks" due to the nature of religious services, "where congregants sit close, take Communion, share hugs and handshakes and pecks on the cheek."[4] The early spread of the virus in Washington, D.C., was linked to a priest who distributed Communion before testing positive.[5] The community believed to be "ground zero" of the devastating outbreak in New York traced the virus's spread to a single person's attendance at

---

[2] Centers for Disease Control and Prevention, *Coronavirus Disease 2019: Protect Yourself*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last visited May 6, 2020).

[3] See Council of State Gov'ts, COVID-19 Resources for State Leaders, https://web.csg.org/ covid19/executive-orders/ (last visited May 6, 2020); see also Oliver Decl. ¶ 18.

[4] Scott Wilson et al., *Coronavirus Creates Conflict for Churches, Where Gatherings Can Be Dangerous but Also Provide Solace*, Wash. Post (Apr. 5, 2020), https://www.washingtonpost.com/national/coronavirus-church-services-outbreak/2020/04/05/7f5b63cc-7773-11ea-90ad-819caa48d39f_story.html; see also Jonathan Shorman, *Kansas Has 3 Church-Related COVID-19 Clusters, State Says Amid Scramble for Supplies*, Wichita Eagle (Apr. 6, 2020), https://tinyurl.com/y9xncmgb.

[5] Fenit Nirappil, *D.C.'s Patient Zero: A Priest's Journey from ICU to Reuniting with Family and Flock*, Wash. Post (Mar. 30, 2020), https://tinyurl.com/ybhpzugb.

a synagogue service.[6]

Virginia has not been spared. An outbreak related to a revival in early March led to at least one—and as many as six—COVID-19-related deaths.[7] In April, the founder of the New Deliverance Evangelistic Church in Chesterfield died of the virus after holding a "well-populated" Sunday service just one day before the Governor issued the gathering restriction.[8]

4.    Relying on input from some of the Nation's leading epidemiologists, doctors, and economists, Virginia has taken numerous steps to limit COVID-19's spread. On February 7, the State Health Commissioner identified COVID-19 as a public health threat. Oliver Decl. ¶ 5. On March 13, the Governor ordered all K-12 schools closed for two weeks, and, on March 20, the Governor and State Health Commissioner limited all restaurants, fitness centers, and theaters to 10 patrons. ¶ 17. The virus, however, continued to spread.

On March 23, the Governor issued Executive Order 53 (EO 53) (Compl. Ex. B, Dkt. 1-3). Emphasizing that "person-to-person contact increases the risk of transmission and community spread,"[9] that Order took various steps to minimize such contacts by prohibiting "*all* public and private in person gatherings of more than 10 individuals," EO 53 ¶ 1 (emphasis added), and imposing additional restrictions on particular entities. K-12 schools were required to cease "in-

---

[6] Erin Ailworth & Alexandra Berzon, *How Coronavirus Invaded One New York Community: 'We Weren't Expecting It to Be Ground Zero,'* Wall St. J. (Mar. 30, 2020), https://tinyurl.com/ y7hh7f8p; Sharon Otterman & Sarah Maslin Nir, *New Rochelle, Once a Coronavirus Hot Spot, May Now Offer Hope*, N.Y. Times (Mar. 27, 2020), https://tinyurl.com/yxxf7c5m.

[7] Jeremy Lazarus, *Revival Linked to COVID-19*, Richmond Free Press (Apr. 30, 2020), http://richmondfreepress.com/news/2020/apr/30/revival-linked-covid-19/.

[8] Michelle Boorstein, *Prominent Virginia Pastor Who Said 'God Is Larger Than This Dreaded Virus' Dies of Covid-19*, Wash. Post (Apr. 13, 2020), https://www.washingtonpost.com /religion/2020/04/13/virginia-pastor-church-dies-coronavirus/.

[9] As noted below, EO 53 was subsequently amended. The original order signed March 23, 2020 is available at https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf. The substantive provisions at issue in this litigation remain unchanged as of the date of filing.

person instruction," and restaurants were directed to close "all dining and congregation areas." ¶¶ 2, 3. Most "brick and mortar retail business[es]" were allowed to stay open so long as they "limit[ed] all in-person shopping to no more than 10 patrons per establishment." ¶ 6. "[R]ecreational and entertainment businesses," however, were required to temporarily "clos[e] [] all public access." ¶ 4. "All businesses" were admonished to "adhere to social distancing recommendations, enhanced sanitizing practices on common surfaces, and other appropriate workplace guidance from state and federal authorities while in operation." ¶ 7.

A week later, the Governor imposed additional restrictions in Executive Order 55 (EO 55) (Compl. Ex. C, Dkt. 1-4). Implementing the Governor's frequent admonitions to stay at home, the first paragraph of EO 55 directed that "[a]ll individuals in Virginia shall remain at their place of residence, except as provided below by this Order and Executive Order 53." ¶ 1.

EO 55 also addressed the temporary gatherings restriction first announced in EO 53. Whereas EO 53 originally stated that the restriction would last through April 23, 2020, see note 9, *supra*, EO 55 extended the temporary gatherings restriction to June 10, see EO 55, p. 3.[10] EO 55 reiterated that the temporary gatherings restriction applied to "*[a]ll* public and private in-person gatherings of more than ten individuals," and specifically stated that "[t]his includes parties, celebrations, religious, or other social events, whether they occur indoor or outdoor." EO 55 ¶ 2 (emphasis added). EO 55 clarified, however, that "[t]his restriction does not apply" to "the operation of businesses not required to close to the public under Executive Order 53" or "the gathering of family members living in the same residence." EO 55 ¶¶ 2 & 2(a)–(b).

5.      Throughout the COVID-19 emergency, the Governor has been careful to preserve

---

[10] Other provisions of EO 53 have also been extended through May 14, 2020. See Second Amended Executive Order 53 (May 4, 2020), https://www.governor.virginia.gov/media/governorvirginiagov/executive-actions/EO-53-SECOND-AMENDED-Extension-of-Temporary-Restrictions-Due-To-Novel-Coronavirus-(COVID-19).pdf.

religious liberty while protecting public safety. None of the Governor's Orders requires places of worship to close, prevents public access to churches or other facilities, or blocks services with a limited number of attendees, and the stay-at-home order specifically permits people to "leave their residence for the purpose of" "[t]raveling to and from one's . . . place of worship." EO 55 ¶ 1(f). Virginia's official coronavirus website also identifies ways that people may continue to practice their faith, including collectively: "Attendees may travel to their place of worship, park in the parking lot and listen to the religious message while remaining in their vehicles" so long as there are "no more than 10 individuals leading the religious ceremony or functioning outside of the church in support of the religious ceremony."[11] It also identifies ways religious leaders may continue to administer sacraments and obtain collections. Consistent with these recommendations, faith leaders have found ways "to engage their followers at a time when they need their faith the most," including "using livestreams, recorded sermons on Facebook, personal outreach, drive-in services in parking lots and videoconference bible study."[12]

6.      Although they have undoubtedly imposed costs on all Virginians, the measures undertaken to fight the spread of COVID-19 also have proven effective. Virginians have "reduced their activities since the Governor declared a state of emergency," corresponding with a "reduction[] in the growth rate of COVID-19 cases." Declaration of Lilian Peake ¶ 8 (attached as Exhibit 2). The evidence shows "that this reduction in activity in Virginia has reduced transmission rates by roughly 50%—from 2.2 transmissions per infection before March 15, 2020, to 1.1 after March 15, 2020." *Id.*

---

[11] *Virginia's Statewide Stay at Home Order: Frequently Asked Questions* at 1–2 (*FAQ*) (attached as Exhibit 3).

[12] Matt Chittum, *From Livestreamed Services to Drive-in Worship, Faith Communities Find Their Way Amid Pandemic*, Roanoke Times (Apr. 4, 2020), https://tinyurl.com/ybmlj6kt (also noting that some places of worship have closed).

But the current progress is fragile. One model "predicts that lifting social distancing restrictions too soon can lead to a rapid increase of COVID-19 cases, resulting in a surge of hospitalizations that has the potential to overwhelm Virginia's healthcare system." Peake Decl. ¶ 9. Virginia's public health officials have therefore warned that, "[e]ven when businesses start to re-open and the stay-at-home order currently in place is lifted, social distancing will remain important to the public health response to COVID-19." ¶ 12.

Heeding that advice, the Governor has announced a multi-phase process to ease the restrictions imposed by Executive Orders 53 and 55. In Phase I, which the Governor has indicated may begin as early as May 15, 2020, businesses required to close may be permitted to open with social distancing measures in place, and the temporary gatherings restriction may be modified as it applies to faith communities.[13]

7.     The sole plaintiff in this case—Lighthouse Fellowship Church (Lighthouse)—is a church located on Chincoteague Island. On April 24, Lighthouse filed suit against Ralph Northam "in his official capacity as Governor of the Commonwealth of Virginia." Compl. ¶ 18. Citing a criminal citation against its pastor on April 5, Lighthouse claimed that *the church itself* is entitled to an injunction barring the Governor from enforcing the temporary gathering restriction on the grounds that it violates the First Amendment to the United States Constitution and the Virginia Act for Religious Freedom. Although Lighthouse did not file suit until more than a month after EO 53 was issued and 19 days after the pastor was cited, Lighthouse asked this Court to issue a temporary restraining order barring the Governor from enforcing the gathering restriction—a measure imposed *literally to save lives*—without even serving the

---

[13] Henry Graff & Brent Solomon, *Northam: Virginia Set to Begin Reopening Plan May 15*, WWBT (May 4, 2020), https://www.nbc12.com/2020/05/04/northam-virginia-set-begin-reopening-plan-may/.

complaint or affording the Governor an opportunity to respond. See Dkt. 3. This Court denied

Lighthouse's request and set the matter for full briefing. See Dkt. 10.

On Friday, May 1, 2020, this Court denied Lighthouse's motion for a preliminary

injunction. Dkt. 16. Lighthouse immediately noticed an appeal, Dkt. 17, and the next day

(Saturday), asked this Court to grant an injunction pending appeal, raising the same arguments

the Court had rejected less than 24 hours earlier. Dkt. 18 at 5 (noting that "this Court has already

determined that Lighthouse's motion for preliminary injunction fails the relevant test"). And one

day after that—Sunday, May 3, 2020—the Federal Government filed a Statement of Interest

urging the Court to "grant the Injunction Pending Appeal" because "the Commonwealth" "ha[d]

not satisfied its burden" as to Lighthouse's constitutional claims. Dkt. 19 at 19–20. Governor

Northam notified the Court of his intent to respond, Dkt. 20, and the Court once again set an

expedited briefing schedule, Dkt. 22.

## LEGAL STANDARD

Federal Rule of Civil Procedure 62(d) permits district courts to grant injunctions pending

appeal. A party seeking the "extraordinary remedy" of interim injunctive relief "must establish

[1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in

the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an

injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20, 24 (2008).

Where, as here, a party is seeking relief "that goes beyond maintaining the status quo . . .

while a lawsuit remains pending," the injunction is classified as "mandatory." *Handsome Brook*

*Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 566 (E.D. Va. 2016); see

*id.* (describing "[t]he status quo" for these purposes as "the last uncontested status between the

parties which preceded the controversy") (quotation marks omitted). "Mandatory preliminary

injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary

circumstances." *Taylor v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994).

## ARGUMENT

For three independent reasons, Lighthouse falls far short of the high bar for proving its entitlement to mandatory injunctive relief. *First*, this Court lacks authority to grant Lighthouse the relief it seeks, both because the Eleventh Amendment precludes an injunction against the Governor on either federal or state-law grounds and because Lighthouse does not have standing to challenge the temporary gatherings restriction in any event. *Second*, even if Lighthouse could somehow overcome those multiple threshold defects, its various causes of action are unlikely to succeed on their own terms. *Third*, Lighthouse has not shown that either the balance-of-equities or public-interest factors favor granting injunctive relief.

## I.    This Court lacks authority to issue the requested injunction against the Governor

For purposes of its current request for interim equitable relief, Lighthouse raises two sets of claims: those alleging violations of the United States Constitution and those alleging violation of the Virginia Act for Religious Freedom. The Eleventh Amendment bars both. The *Ex Parte Young* exception does not authorize suit against the Governor on Lighthouse's federal claims, and the rule of *Pennhurst State Sch. & Hosp. v. Halderman* precludes relief on its state claims. In addition, Lighthouse lacks standing to challenge the temporary gatherings restriction on either federal or state law grounds, because the challenged rule restricts only the conduct of *individuals* rather than *entities* (including Lighthouse).[14]

---

[14] The complaint raises several claims that the motion for injunctive relief omits, including an Equal Protection Clause claim, Compl. ¶¶ 147–57; a claim under Article IV, § 4 of the federal Constitution, ¶¶ 158–65; several state constitutional claims, ¶¶ 166–203; and a claim under the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc *et seq.*, see Compl. ¶¶ 204–16. Because Lighthouse did not base its request for interim relief on any of these claims, they are not currently before the Court. In any event, the same jurisdictional defects would preclude injunctive relief on those claims as well.

### A.     Lighthouse's federal claims are barred by the Eleventh Amendment

1.     The Eleventh Amendment "render[s] States immune from being hauled into federal court by private parties." *Wright v. North Carolina*, 787 F.3d 256, 261 (4th Cir. 2015). State officers sued in their official capacity—as Governor Northam is here, Compl. ¶ 18—are "also entitled to Eleventh Amendment protection" because official-capacity suits are in effect suits against the State. *Lytle v. Griffith*, 240 F.3d 404, 408 (4th Cir. 2001); accord *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (noting that "a suit against a state official in his or her official capacity" is "no different from a suit against the State itself").

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized an exception to Eleventh Amendment immunity that permits a federal court to grant prospective relief against a state officer when that officer acts in violation of federal law. As the Court explained, the exception is based on the "fiction" that an officer who acts unconstitutionally is "stripped of his official or representative character" and may therefore be "subject[]" to "the consequences of his individual conduct" in federal court. *Id.* at 159–60.

Although this doctrine provides an avenue for plaintiffs seeking injunctive relief against States, "[t]he purpose of allowing suit against state officials to enjoin their enforcement of an unconstitutional statute is not aided by enjoining the actions of a state official not directly involved in enforcing the subject statute." *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 332 (4th Cir. 2001) (*Gilmore*). Accordingly, the *Young* exception is limited to situations where a plaintiff can show: (1) a "special relation" between the officer sued and the challenged policy; and (2) the officer has "acted or threatened" to enforce the policy. *McBurney v. Cuccinelli*, 616 F.3d 393, 399, 402 (4th Cir. 2010). These requirements ensure both that "the appropriate party is before the federal court, so as not to interfere with the lawful discretion of state officials" and that "a federal injunction will be effective with respect to the underlying

10

claim." *South Carolina Wildlife Fed. v. Limehouse*, 549 F.3d 324, 333–34 (4th Cir. 2008).

The Fourth Circuit has repeatedly found that actions against a State's Governor fail to satisfy the *Young* prerequisites. In *Gilmore*, for example, the Fourth Circuit dismissed Virginia's Governor from a case alleging constitutional infirmity with five statutes involving the transportation and disposal of municipal solid waste. "[A]lthough Governor Gilmore [was] under a *general* duty to enforce the laws of Virginia by virtue of his position as the top official of the state's executive branch," the Court explained, "he lack[ed] a *specific* duty to enforce the challenged statutes." 252 F.3d at 331. In *Allen v. Cooper*, 895 F.3d 337 (4th Cir. 2018), the Fourth Circuit likewise declined to apply the *Young* exception to a suit against the Governor of North Carolina, explaining that when a plaintiff sues "to enjoin the enforcement of an act alleged to be unconstitutional, the exception applies *only* where a party defendant in [such] a suit . . . has some connection with the enforcement of the Act." *Id.* at 355 (emphasis added; quotation marks omitted). Numerous other decisions from within this circuit have also rejected attempts to sue state governors under *Ex Parte Young*. See, *e.g.*, *Kobe v. Haley*, 666 Fed. Appx. 281, 300 (4th Cir. 2016); *Virginia Uranium, Inc. v. McAuliffe*, 147 F. Supp. 3d 462, 467–68 (W.D. Va. 2015); *Harris v. McDonnell*, 988 F. Supp. 2d 603, 606 (W.D. Va. 2013); *North Carolina State Conference of NAACP v. Cooper*, 397 F. Supp. 3d 786, 800–02 (M.D.N.C. 2019).

2.      These precedents preclude this suit against Governor Northam. As in *Gilmore* and *Cooper*, the Governor's "*[g]eneral* authority to enforce the laws of the state is not sufficient to make [him a] proper part[y] to litigation challenging the law." *Gilmore*, 252 F.3d at 331 (emphasis added; citation omitted). And, like in those cases, Governor Northam has no specific authority to enforce Executive Orders 53 and 55. The Code of Virginia authorizes the Governor to "issue" executive orders, but nowhere does it authorize him—personally—to enforce them.

Va. Code Ann. § 44-146.17(1). Nor do Executive Orders 53 and 55 contemplate personal

enforcement by the Governor, either expressly or by implication. To the contrary, the Orders

make violations punishable as a misdemeanor offense, the prosecution of which is committed to

the discretion of Commonwealth's Attorneys. See Va. Code Ann. § 15.2-1627

(Commonwealth's Attorney has "discretion" to "prosecute Class 1 . . . misdemeanors"); accord

*McBurney*, 616 F.3d at 399 (Attorney General had no "special relation" to alleged violations of

the Virginia Freedom of Information Act where Commonwealth's Attorneys are authorized to

enforce the Act). For that reason, the Governor has no "special relation" to the challenged action

for purposes of *Young.*

The second *Young* requirement is also lacking here because Lighthouse has failed to

allege—much less demonstrate—that *Governor Northam* "has . . . acted or threatened to act" to

enforce the gathering restriction. *McBurney*, 616 F.3d at 402. The complaint makes abundantly

clear that local police, not the Governor, are responsible for enforcement. Compl. ¶¶ 39–53. Nor

has the Governor encouraged local authorities to take action against Lighthouse, its members, its

pastor, or any other faith community. In fact, as Lighthouse's own exhibit shows, the Governor

has *discouraged* the approach local authorities are alleged to have taken in this case. See Compl.

Ex. D (Dkt. 1-5) at 1 ("Governor Northam has directed state and local law enforcement to

initially address violations of the [Executive Order] directives with education and warnings.").

Where a state official has neither "personally" enforced a challenged policy nor "advised any

other [officials] to do so," the "*Young* fiction cannot apply." *McBurney*, 616 F.3d at 402.

3.       The fact that the gathering restriction is found in an executive order rather than a

state statute does not alter the analysis. Facing a challenge to another executive order issued

during the COVID-19 pandemic, the Fifth Circuit held that claims against the Governor of Texas

could not proceed. *In re Abbott*, No. 20-50296, 2020 WL 1911216, at *6–7 (5th Cir. Apr. 20, 2020). Although the Governor had issued the challenged order, the potential penalties were enforced by health and law enforcement officials. *Id.* at *6. As the Fifth Circuit explained, "[t]he power to promulgate law is not the power to enforce it." *Id.* Without the latter, the *Young* exception did not apply and the Eleventh Amendment precluded the plaintiffs' claim against the Governor. *Id.* [15]

### B.      The Eleventh Amendment bars this Court from enjoining the Governor based on alleged violations of the Virginia Act for Religious Freedom

It is black-letter law that federal courts may not grant injunctive relief "against state officials on the basis of state law." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 117 (1984). This rule follows from the logic of *Young*, which was premised on the need to promote the supremacy of *federal* law. *Young*, 209 U.S. at 160. So where "a plaintiff alleges that a state official has violated *state* law," the premise for the *Young* doctrine "disappears" and the Eleventh Amendment applies with full force. *Pennhurst*, 465 U.S. at 106. Otherwise, a federal court would be in the position of "instruct[ing] state officials on how to conform their conduct to state law"—a function not permitted under the Eleventh Amendment. *Id.*; accord *Suarez Corp. Indus. v. McGraw*, 125 F.3d 222, 228 (4th Cir. 1997) ("[A] claim seeking injunctive relief for a state official's violation of state law . . . is barred by the Eleventh Amendment."). The Eleventh Amendment thus bars this Court from granting an injunction on Lighthouse's state law claims.

### C.      Lighthouse lacks standing to raise either its federal or state claims because the temporary gatherings restriction applies to *individuals*, not entities

As "the party invoking the jurisdiction of the court," Lighthouse "bears the burden of establishing standing." *Bishop v. Bartlett*, 575 F.3d 419, 424 (4th Cir. 2009). To satisfy Article

---

[15] Although the Commonwealth joined an amicus brief supporting the plaintiffs in *In re Abbott,* that brief did not address whether the Governor was amenable to suit under *Young*.

III's case-or-controversy requirement, a complaint's allegations must demonstrate that "the *particular* plaintiff is entitled to an adjudication of the *particular* claims asserted." *Allen v. Wright*, 468 U.S. 737, 752 (1984) (emphases added). In contrast, a "generalized interest" shared by all citizens in "constitutional governance" is inadequate to establish a specific party's standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 576 (1992).

      1.    The only plaintiff in this suit is Lighthouse Fellowship Church. Compl. ¶ 17. But the challenged action—the temporary gatherings restriction—applies only to *people*, not *entities*. Compare EO 55 ¶ 2 (prohibiting "[a]ll public and private in-person gatherings of more than ten *individuals*") (emphasis added), with EO 53 ¶¶ 2–8 (imposing additional restrictions on various entities, none of which are churches). The fact that the temporary gatherings restriction is enforced through criminal sanctions, see EO 53, p. 4; EO 55, p.2, confirms that fact. "[C]riminal charges are personal in consequence" and therefore do not support an entity's standing to challenge an enactment "in its own right." *White's Place, Inc. v. Glover*, 222 F.3d 1327, 1330 (11th Cir. 2000); see also *id.* ("The corporation itself has not, and could not, be arrested."). And because Lighthouse has made no effort to assert that it has suffered any *other* injuries that are traceable to the temporary gatherings restrictions (such as loss of funds due to decreased collections, or loss of standing in the community) it has not established its *own* standing as required by Article III. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

      2.    Nor could Lighthouse salvage its current claims under a theory of associational standing.[16] As a general matter, courts have recognized that associations may bring suit on behalf of their members in certain circumstances. See, *e.g.*, *Hunt v. Washington State Apple Advert.*

---

[16] Lighthouse likewise cannot establish third-party standing. That doctrine applies only where a plaintiff can show that "the third party cannot effectively protect its own interests." *A Helping Hand, LLC v. Baltimore Cty*, 515 F.3d 356, 363 n.3 (4th Cir. 2008). No such allegation has been made—much less supported—here.

*Comm'n*, 432 U.S. 333, 343 (1977). To prove associational standing, however, a plaintiff must demonstrate that "its members would otherwise have standing to sue in their own right." *Id.*

Lighthouse attempts no such showing. The complaint is not supported by any affidavits or other competent evidence that specific church members have experienced any harm satisfying Article III. To be sure, the verified complaint bears Pastor Wilson's signature and describes events leading to a criminal summons against him. But any attempt by Lighthouse to rely on Pastor Wilson to establish its own standing would run headlong into *Younger v. Harris*, 401 U.S. 37, 41 (1971), which "forbid[s]" federal courts from "enjoin[ing] state court proceedings." See also *Moore v. City of Asheville,* 396 F.3d 385, 396 (4th Cir. 2005) (holding that *Younger* applied where street preacher filed federal suit challenging constitutionality of local noise ordinance under which he had been cited); *Kowalski v. Tesmer*, 543 U.S. 125, 133 (2004) ("The doctrine of *Younger v. Harris* reinforces our federal scheme by preventing a state criminal defendant from asserting ancillary challenges to ongoing state criminal procedures in federal court." (citation omitted)). Indeed, Pastor Wilson's pending criminal proceeding, see Compl. ¶ 53—and courts' "unwillingness to allow the *Younger* principle to be . . . circumvented," *Kowalski*, 543 U.S. at 133—provides yet another reason to conclude that Lighthouse cannot pursue the claims alleged in the complaint in its own right. See *Tony Alamo Christian Ministries v. Selig*, 664 F.3d 1245, 1248 (8th Cir. 2012) (holding that district court should have abstained under *Younger* where church brought claims that overlapped with state-court proceedings of its individual members).[17]

---

[17] The Court need not reach the standing analysis at all should it conclude that *Younger* applies. See *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007) (noting that "federal court" need not "decide whether the parties present an Article III case or controversy before abstaining under *Younger v. Harris*").

## II.     Lighthouse's claims are unlikely to succeed on the merits

Even if Lighthouse could overcome the Eleventh Amendment and establish standing, it still would be unlikely to succeed on the merits of any of its claims. To support its request for emergency relief, Lighthouse points to two sources of authority: (1) various provisions of the First Amendment (including the Free Exercise, Establishment, Free Speech, and Assembly Clauses); and (2) the Virginia Act for Religious Freedom, Va. Code Ann. § 57-1 *et seq.* But not all executive orders issued to address the threat of COVID-19 are the same, and Lighthouse has not shown that Governor Northam's neutral and generally applicable temporary gatherings restriction violates any of these provisions.[18]

### A.     The temporary gatherings restriction is a good-faith, evidence-based emergency measure deserving of this Court's deference

Lighthouse's challenges fail at the outset because it does not acknowledge (much less engage with) the relevant framework. Because "[d]ealing with . . . an emergency situation requires an immediacy of action that is not possible for judges," courts have long emphasized that the elected branches must be able to take decisive actions to address matters of urgent concern. *United States v. Chalk*, 441 F.2d 1277, 1281 (4th Cir. 1971). In evaluating the lawfulness of measures taken during an emergency, the Fourth Circuit has held that "the scope of [a court's] review . . . must be limited to a determination of whether the [executive's] actions were taken in good faith and whether there is some factual basis for [the Governor's] decision

---

[18] Although not raised in the current motion, Lighthouse's RLUIPA, Equal Protection, and Republican Form of Government claims fail as well. RLUIPA applies to "land use regulation[s]" such as zoning ordinances, 42 U.S.C. § 2000cc(a)(1), not restrictions on individual conduct like the temporary gatherings restriction. See, *e.g.*, *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 552–53 (4th Cir. 2013). The equal protection claim fails because the challenged restriction applies equally to all gatherings. See *infra*. And the Supreme Court "has several times concluded that" Article IV, § 4 "does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019).

that the restrictions he imposed were necessary to maintain order." *Id.* at 1281. That standard reflects the reality that "[i]t is no part of the function of a court" to determine which measures are "likely to be the most effective for the protection of the public against disease," *Jacobson v. Massachusetts*, 197 U.S. 11, 30 (1905), and that "governing authorities must be granted the proper deference and wide latitude necessary for dealing with . . . emergenc[ies]," *Smith v. Avino*, 91 F.3d 105, 109 (11th Cir. 1996).

It is difficult to imagine a more apt circumstance for applying that framework than the current emergency. Authorities estimate that 1.5 to 2.2 million Americans might have died had governments done nothing to stop the virus,[19] and a battery of evidence supports the conclusion that minimizing close, person-to-person contact is necessary to curb its spread. Oliver Decl. ¶ 17. The Governor's step-by-step approach refutes any suggestion that he acted arbitrarily or without due consideration of the difficult issues involved. In short, it is beyond debate that the Governor acted in good faith in imposing the gathering ban. See *Hall v. Northam*, No. CL2000632-00, at 2 (Culpeper Cir. Ct. April 30, 2020) (attached as Exhibit 4) (holding that the Governor's COVID-19 Orders "are not plainly wrong, grossly negligent, executed in bad faith or issued in violation of the United States or Virginia Constitutions"). Accordingly, as even the Federal Government acknowledges, the Governor's chosen strategy for slowing the spread of COVID-19 and saving lives warrants deference. Dkt. 19 at 1, 10, 14.

### B. Lighthouse's various First Amendment challenges would likely fail even under the standards applicable to non-emergency measures

For the reasons just explained, this Court's review of Lighthouse's claims should reflect the exigencies of the moment. But Lighthouse's constitutional claims would also fail under the

---

[19] William Wan et al., *Experts and Trump's Advisers Doubt White House's 240,000 Coronavirus Deaths Estimate*, Wash. Post (Apr. 2, 2020), https://tinyurl.com/vymlmsy.

usual standards of judicial review.

Lighthouse raises three different categories of First Amendment objections to the temporary gatherings restriction: the Free Exercise Clause, the Establishment Clause, and the Free Speech and Assembly Clauses. The Federal Government supports Lighthouse's claims as to the Free Exercise Clause. Each of those challenges, however, suffers from the same fundamental defect: misreading a *universal* restriction on gatherings as a *targeted* attack on a particular form of worship. Because Virginia's temporary gatherings restriction applies to *gatherings*—regardless of their character, location, or any speech-related conduct that takes place at them—Lighthouse cannot show it is likely to succeed on any of its First Amendment claims.

### 1. *The Free Exercise Clause*

a.    "[T]he right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 879 (1990) (quotation marks and citation omitted) (collecting cases). By contrast, "the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct *because* it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993) (emphasis added).

b.    Lighthouse does not (and could not plausibly) allege that the challenged Orders prohibit gatherings of more than 10 people "*because*" they are "undertaken for religious reasons," *Lukumi*, 508 U.S. at 532 (emphasis added). To the contrary, EO 53 and EO 55 apply to "*all* public and private in person gatherings of" the requisite number of people. EO 53 ¶ 1 (emphasis added); accord EO 55 ¶ 2. And both Executive Orders provide a reason for the restriction that has nothing to do with the religious motivations of any gathering: slowing the

spread of a once-in-a-century global pandemic. See EO 53, p. 1; EO 55, p. 1.

c.        Instead, Lighthouse argues that Virginia's temporary gatherings restriction discriminates against religious exercise for two reasons. Both lack merit.

i.        Lighthouse insists that the gathering restriction is discriminatory because it specifically mentions "religious" gatherings. Dkt. 3 at 6–7; Compl. ¶ 31. But, as this Court has already concluded, EO 55 "merely uses religious gatherings as one of several examples of 'all public and private in-person gatherings.'" Dkt. 16 at 10. Put differently, the reference is intended to demonstrate that "all gatherings" really means "*all* gatherings." EO 55 ¶ 2; see *id.* ("All public and private in-person gatherings of more than ten individuals are prohibited. This *includes* parties, celebrations, religious, or other social events, whether they occur indoor or outdoor.") (emphasis added). The temporary gatherings restriction draws no distinction between religious and non-religious "gatherings," which is precisely what makes it religiously neutral.

ii.        Lighthouse and the Federal Government also assert that the temporary gatherings restriction is not generally applicable because "businesses such as liquor stores, warehouse clubs, supercenter stores, and even 'non-essential' retail stores are exempted from the broad prohibitions" on gatherings. Dkt. 3 at 7; see Dkt. 19 at 6–7, 14–16. Lighthouse acknowledges that the Executive Orders "prohibit 'all gatherings,'" but insist that the Orders "define 'all gatherings' to *exclude* large crowds and masses of people gathered at numerous businesses and other non-religious entities." Dkt. 3 at 8 (emphasis added). According to Lighthouse and the Federal Government, "'religious' gatherings of more than 10 individuals are prohibited, but large numbers of people may gather at liquor, warehouse, and supercenter stores." *Id.*; see Dkt. 19 at 6 ("The Orders, however, permit various secular activities resulting in gatherings of more than ten people."). And, having so interpreted the Orders, Lighthouse argues that the failure to

specifically exempt religious services shows that the Governor determined that "the governmental interests [he] seeks to advance are worthy of being pursued *only against conduct with religious motivation*." Dkt. 3 at 8 (quoting *Lukumi*, 508 U.S. at 543).[20]

That argument is built on a misreading of Virginia's specific COVID-19 Orders. In particular, Lighthouse and the Federal Government elide the distinction between the *temporary gatherings restriction* (which applies to religious gatherings) and the *separate, business-related provisions* (which neither expand nor limit the temporary gatherings restriction).

The overarching purpose of both Executive Orders is "minimizing the spread of COVID-19" by limiting "[u]nnecessary person-to-person contact." Note 9, *supra*. Both EO 53 and EO 55 implement that purpose in two steps: first, by announcing a globally applicable restriction; and second, by announcing more targeted restrictions applicable only to certain organizations or activities. EO 53, for example, begins by announcing a rule that governs all people in Virginia: for a limited time, "*all* public and private in person gatherings" of a certain size are prohibited *regardless* of the nature of the gathering or the identity of the people participating. EO 53 ¶ 1 (emphasis added). EO 53 then creates separate and additional frameworks that govern particular businesses, organizations, and activities—many of which impose restrictions that sweep far beyond the general restrictions that apply to all gatherings. See, *e.g.*, EO 53 ¶ 3 (requiring "[c]losure of all dining . . . areas in restaurants," regardless of the number of people present); ¶ 4 (requiring "[c]losure of all public access" to specifically enumerated "recreational and entertainment businesses"). In the same vein, EO 55 begins with two universal restrictions (a

---

[20] The Federal Government also suggests that the Orders are not religiously neutral because there is a "value judgment inherent in providing exemptions for secular activities that impact the Commonwealth's interests while not providing exemptions for Plaintiff's religious activities." Dkt. 19 at 16. No such judgment has been made. As explained in the text, the "exemptions" on which the Federal Government's argument relies are not exemptions at all.

stay-at-home order and temporary gatherings ban), see EO 55 ¶¶ 1–2, and then sets forth
additional restrictions applying to certain entities or locations, ¶¶ 3–5.

Because the temporary gatherings restriction and the business-related provisions operate
independently, any status conferred upon a given business does not alter its *employees'* or
*customers'* obligation to adhere to the temporary gatherings restriction. Whether a given business
is "[e]ssential," EO 53 ¶ 5, non-essential, ¶ 4, or "recreational," ¶ 3, for example, impacts only
the number of patrons permitted inside a given facility at any given time. But those labels have
no impact on whether any employees or customers (if any) may gather once they are inside those
businesses. Even inside an essential retail business (for example, a grocery store), patrons are
still prohibited from congregating in groups of "more than 10 individuals" because the temporary
gatherings restriction forbids "*all* public and private in person gatherings," regardless of their
location. EO 53 ¶ 1; accord EO 55 ¶ 2.

This distinction accords with the plain meaning of the term "gathering" and the reasons
Governor Northam has temporarily prohibited them. Cf. *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566
U.S. 560, 566 (2012) ("When a term goes undefined in a statute, [courts] give the term its
ordinary meaning."). "The purpose of any gathering—be it social, religious, or educational—is
to bring people together to communicate and interact with each other for a sustained period of
time." Oliver Decl. ¶ 22. "By contrast, people who happen to run errands or shop at the same
time do not go to the store with the purpose of staying and interacting with others; instead, they
pick up what they need and leave." *Id.* Indeed, "[i]ndividuals observing social distancing
requirements will actually do the opposite of 'gathering' when they venture out to gather
supplies—they will intentionally avoid other individuals and maintain as much separation as
possible." *Id.* "For these reasons, brief incidental contact at a grocery store or bank poses less of

a risk of spreading COVID-19 than a gathering of more than 10 individuals that purposefully brings people into contact for some duration of time." *Id.*

The three photos of superstore parking lots cited by Lighthouse (see Compl. ¶¶ 59–60) illustrate the point. Simply by visiting those stores, patrons are not "gathering" in any ordinary sense of the word. Those patrons are not engaged in any sort of "meeting" or "assembly,"[21] nor do they constitute "a party" in which "many people come together as a group."[22] Were they, however, to "come together as a group" to hold such a "meeting" or "assembly," those patrons *would* violate the temporary gatherings restriction, even if they were located inside an essential retail business's facility when they did so. So too would a group of more than 10 employees "gathering in conference rooms or any other part of [an] office[]." Dkt. 19 at 15.

If there were any doubt about the manner in which the various provisions operate, the Governor has issued guidance that removes it. That guidance—which is published on Virginia's official coronavirus website—specifically explains that, although the Executive Orders also place certain limits on the operation of businesses, "[t]he *Gathering Ban* and the restrictions imposed on businesses and other entities are distinct requirements." *FAQ* (attached as Ex. 3) at 2–3. "The *Gathering Ban*," it explains, imposes a "mandate on every individual in the Commonwealth to refrain from congregating in close physical proximity to ten or more other individuals, *regardless of location*." *Id.* (emphasis added). And although various provisions of the Governor's Executive Orders permit more than 10 people to be present at a given "building, facility, or worksite" at a specific time, the guidance explains that "[t]he mere presence of more than 10 people working inside a business' building, facility, or worksite is not a 'gathering' so

---

[21] *Gathering*, Definition (Merriam-Webster), https://www.merriam-webster.com/dictionary/gathering (last visited May 6, 2020).

[22] *Gathering*, Definition (Cambridge Dictionary), https://dictionary.cambridge.org/us/dictionary/english/gathering (last visited May 6, 2020).

long as such individuals do not congregate in a single physical space." *Id.* [23]

In short, Lighthouse and the Federal Government are simply wrong in asserting that "liquor stores, warehouse clubs, supercenter stores, and even 'non-essential' retail stores are exempted" from the temporary gatherings restriction, Dkt. 3 at 7, or that "the Orders do not limit the ability of employees of any non-retail business, including but not limited to professional services businesses, to gather." Dkt. 19 at 6. The plain text of the Executive Orders prohibits "*all* public and private in person gatherings." EO 53 ¶ 1 (emphasis added); accord EO 55 ¶ 2.[24]

d.      Because the temporary gatherings restriction is "a neutral government decision of general applicability," it "is subject to rational basis review, even [though] it has the incidental effect of burdening religious exercise." *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cty.*, 915 F.3d 256, 265 (4th Cir. 2019). That bar is easily cleared here.

"To pass muster under rational basis review, [government action] need only be rationally related to a legitimate government interest." *Capital Associated Indus., Inc. v. Stein*, 922 F.3d 198, 210 (4th Cir. 2019) (quotation marks and citation omitted). The legitimacy of the

---

[23] The Federal Government likewise misreads EO 55's second paragraph as "*excluding from* the ten-person gathering limit any business 'not required to close to the public under Executive Order 53.'" Dkt. 19 at 6 (quoting EO 55 ¶ 2(a) (emphasis added)). That provision provides that "[t]his restriction"—that is, the prohibition on "in-person gatherings of more than ten individuals"—"does not apply to" two things: (1) "*the operation of* businesses not required to close to the public under Executive Order 53;  and (2)  "the gathering of family members living in the same residence." EO 55 ¶ 2 (emphasis added). Only the (unchallenged) family-members provision is framed as an exception to the ban on "gatherings." And, as noted in the text, the Governor has made clear the gatherings restriction "is a mandate on every individual in the Commonwealth to refrain from congregating in close physical proximity to ten or more other individuals, *regardless of location*" and that the role of ¶ 2(a) of EO 55 is simply to underscore that the "mere presence of more than 10 people working inside a business' building, facility, or worksite is not a 'gathering' *so long as* such individuals do not congregate in a single physical space." *FAQ* at 2–3 (emphasis added).

[24] Although the complaint also includes a photograph of Governor Northam's press briefing, Compl. ¶ 58, neither Lighthouse nor the Federal Government argues that governmental efforts to keep the public informed about an ongoing emergency prevent measures to address that emergency from being generally applicable.

government's interest in saving lives and protecting public health during a crisis of this magnitude cannot reasonably be questioned. See *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995) ("[T]he Government [] has a significant interest in protecting the health, safety, and welfare of its citizens."); *Workman v. Mingo Cty. Bd. of Educ.*, 419 Fed. Appx. 348, 353 (4th Cir. 2011) (noting that a "state's wish to prevent the spread of communicable diseases . . . constitutes a compelling interest"). And the temporary gatherings restriction is rationally related to that interest because all available evidence supports the commonsense proposition that minimizing in-person gatherings helps prevent the spread of a respiratory disease that has proven to be particularly deadly in crowds. See Oliver Decl. ¶ 20.

### 2.   *The Establishment Clause*

Lighthouse next re-casts almost precisely the same argument under the Establishment Clause. See Dkt. 3 at 9–12. Relying on a recent decision involving a different gatherings restriction issued by a different Governor in a different State, Lighthouse asserts (at 10) that the temporary gatherings restriction violates the Establishment Clause because "religious gatherings were 'targeted for stricter treatment due to the nature of the activity involved.'" (quoting *First Baptist Church v. Kelly*, No. 20-1102-JWB, 2020 WL 1910021, at *7 (D. Kan. Apr. 18, 2020)). As previously explained, Lighthouse is wrong about how Virginia's temporary gatherings restriction works. And, even if Lighthouse were right, there would be no violation of the Establishment Clause (as opposed to the Free Exercise Clause).

There are "three evils" against which the Establishment Clause "afford[s] protection: sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971) (quotation marks and citation omitted). Lighthouse does not even attempt to argue that Governor Northam has engaged in any of these activities. Quite the contrary: this entire suit is premised on the contention that the Governor is

24

*suppressing* religious worship.

As this Court has already concluded, "no reasonable observer would believe the Orders disapprove of any particular religion or of religion generally." Dkt. 16 at 18. Nor could Pastor Young's citation for violating the Order "reasonably [be] viewed as an 'excessive entanglement.'" *Id.* at 19. Accordingly, Lighthouse has not even identified—much less shown it is likely to succeed on—a claim under the Establishment Clause.

### 3.      *The Free Speech and Assembly Clauses*

Lighthouse offers several theories for why the temporary gatherings restriction violates the First Amendment's free speech and assembly guaranties. Dkt. 3 at 12–19. [25] None is likely to succeed. To the extent that the gatherings restriction indirectly restricts speech (by Lighthouse or anyone else), it represents a permissible content-neutral time, place, and manner restriction. [26]

a.      The temporary gathering restriction is content-neutral, and therefore subject to (at most) intermediate scrutiny. See *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 512–13 (4th Cir. 2002). "The principal inquiry in determining content neutrality . . . in time, place, or manner cases . . . is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Courts generally determine whether a given restriction is "justified without reference to the content of the regulated speech," *id.*, by examining how the regulation defines what is and what is not

---

[25] Although Lighthouse grounds these claims in its "rights to speech *and assembly*," Dkt. 3 at 12 (emphasis added), it offers no independent analysis for any right-of-assembly claim. For that reason, this memorandum analyzes the two claims simultaneously.

[26] As an alternative rationale, this Court applied the similar test from *United States v. O'Brien*, 391 U.S. 367, 376 (1989), which looks to whether a restriction with incidental effects on expressive conduct is "within the constitutional power of the Government . . . furthers an important or substantial governmental interest . . . unrelated to the suppression of free expression . . . [and] is no greater than is essential to the furtherance of that interest." *Id.* at 376. As the Court concluded, the gathering restriction easily passes that test. Dkt. 16 at 21–22.

permissible speech. The Supreme Court has, for example, held impermissible a restriction that identified prohibited speech "not in terms of time, place, and manner, but in terms of subject matter." *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 99 (1972).

The temporary gatherings restriction is not based on the content—or even the existence—of constitutionally protected speech. That restriction prohibits "[a]ll public and private in-person gatherings of more than 10 individuals," EO 55 ¶ 2, *regardless* of what happens at those gatherings. Nor does the purpose of the temporary gathering restriction have anything to do with the content of any speech it may incidentally limit. Accordingly, the "less demanding" intermediate scrutiny standard applies. *Carandola*, 303 F.3d at 513.

b. When reviewing content-neutral time, place, and manner restrictions, courts "engage[] in a two-part analysis": "determin[ing] whether the regulation materially advances an important or substantial interest"; and, if so, "ask[ing] whether the regulation is narrowly tailored to serve that interest." *American Entertainers, L.L.C. v. City of Rocky Mount, N.C.*, 888 F.3d 707, 716 (4th Cir. 2018) (quotation marks, alterations, and citation omitted). Both requirements are satisfied here.

i. The importance of the government's interest in preserving lives and health during a global pandemic requires little discussion. "The Government [] has a significant interest in protecting the health, safety, and welfare of its citizens," *Rubin*, 514 U.S. at 485, and a "state's wish to prevent the spread of communicable diseases . . . constitutes a compelling interest." *Workman*, 419 Fed. Appx. at 353. The temporary gathering restriction also materially advances that interest by implementing social-distancing measures designed "to mitigate the spread of the [virus] and its effects on Virginians." EO 53, p.1; see also Oliver Decl. ¶¶ 16–17.

ii. Executive Order 53's temporary gathering restriction is also "narrowly tailored to

serve [the relevant] interest." *American Entertainers*, 888 F.3d at 716. For these purposes, "[a]

regulation is narrowly tailored . . . if it 'promotes a substantial government interest that would be

achieved less effectively absent the regulation' and does not 'burden substantially more speech

than is necessary to further the government's legitimate interests.'" *Ross v. Early*, 746 F.3d 546,

552–53 (4th Cir. 2014) (quoting *Ward*, 491 U.S. at 799). The temporary gatherings restriction

directly promotes the interest in preserving life and safety by implementing targeted social-

distancing measures that reflect the recommendations of public health officials across the

country. See Dkt. 19 at 9 (describing CDC guidelines). And the temporary gathering restriction

does not burden "substantially more speech than is necessary," *Ross*, 746 F.3d at 552–53, both

because it is limited in time and because it tracks exactly the 10-person number public health

officials have identified. See Oliver Decl. ¶¶ 18, 21–24. As this Court explained, "[t]he

substantial interest in slowing the spread of this highly contagious virus and saving human life

would be achieved less effectively if more people . . . are permitted to gather in groups larger

than ten." Dkt. 16 at 25.

      c.     Finally, the temporary gatherings restriction leaves "open ample alternative

channels for communication of [] information," *Ward*, 491 U.S. at 791, including *all* forms of

communication that do not involve being together in person, as well as communication through

in-person groups of fewer than 10 people. And to the extent that gathering in groups of larger

than 10 has advantages over gathering in groups of 10 or fewer, "there is no reason to believe

that these same advantages cannot be obtained through other means, such as gathering in groups

of ten or fewer multiple times per day or week, mailing letters, sending emails, livestreaming

services, posting services on YouTube, Facebook, or other free internet platforms, or deploying

some combination of all these methods." Dkt. 16 at 25 (quotation marks omitted).[27]

### C. Lighthouse's state law challenge would likely fail even under the standards applicable to non-emergency measures

Lighthouse's final argument is that the temporary gatherings restriction violates § 57-2.02 of the Code of Virginia. As previously explained, this Court cannot grant injunctive relief against state officials based on violations of state law. See p. 13, *supra*.

Lighthouse's state law claim also fails on the merits. Lighthouse relies (at 19–20) on Va. Code Ann. § 57-2.02(b), which provides that "[n]o government entity shall substantially burden a person's free exercise of religion" unless the "application of the burden to the person" satisfies strict scrutiny. But even assuming that a temporary restriction on the number of parishioners who may attend in-person services at one time constitutes a substantial burden (but see Dkt. 16 at 28–30), the statute also provides that "[n]othing in this section shall prevent any governmental institution or facility from maintaining health, safety, security or discipline." § 57-2.02(e).

The plain terms of § 57-2.02(e) plainly encompass emergency measures taken to preserve life and curb the spread of a pandemic.[28] The temporary gatherings restriction is explicitly grounded in concerns about "health" and "safety." § 57-2.02(e). When the Governor announced the temporary gatherings restriction, he made clear that "[p]rotecting the health and ensuring the safety of every Virginian is my highest priority."[29] And when the Governor amended EO 53 to extend some of its provisions, he did so because he found it "necessary to extend certain

---

[27] As this Court observed, Lighthouse's argument that the temporary gatherings restriction is "an unconstitutional prior restraint," Dkt. 3 at 15, fails because there is no prior restraint at issue, Dkt. 16 at 21 n.2. And Lighthouse's "unconstitutional discretion" claim fails because the Orders are "clearly outside the bounds of [the] case law" on which it relies. *Id.* at 27.

[28] To the extent there is any ambiguity (see Dkt. 16 at 30), it is Lighthouse that "must establish that [it] is likely to succeed on the merits." *Winter*, 555 U.S. at 20.

[29] Note 9, *supra*.

measures previously undertaken to ensure the safety and wellbeing of Virginians." EO 53, p.1.

Through its state law claim, Lighthouse seeks to enjoin precisely the kind of government action the General Assembly saw fit to protect under § 57-2.02: measures intended to "maintain[] health [and] safety" of Virginians. Va. Code § 57-2.02(e). If § 57-2.02(e) did not apply in these circumstances, it is not clear why it would have been included at all.

### III.    The balance of equities and public interest factors independently foreclose injunctive relief

1.      It is important to define the precise "harm" Lighthouse seeks to prevent. No Executive Order requires Lighthouse to close its doors or prevents it from holding in-person worship services of 10 people or fewer. Contra Dkt. 3 at 1 (asserting that the Orders prohibit "gathering for worship services"). No Order prevents Lighthouse from holding an online service. And here—unlike the situations discussed in various out-of-state cases on which Lighthouse and the Federal Government rely—there is nothing to prevent Lighthouse from hosting a service of any size so long as participants stay in vehicles and observe social distancing. See pp. 5–6, *supra*.[30] That does not mean, of course, that Lighthouse's congregants—like others who generally meet in larger, in-person groups—have experienced no loss. But it does mean that any harm in this case is limited to the inability to host a service involving more than 10 people.

2.      The harm Lighthouse will experience if this Court denies the requested injunction must be balanced against the catastrophic and permanent harm that others could suffer if the Court grants one. See *Winter*, 555 U.S. at 24. Here, the almost inevitable result of granting the

---

[30] For that reason (as well as several others), the Sixth Circuit's decision in *Maryville Baptist Church, Inc. v. Beshear*, No. 20-5427, slip op. (6th Cir. May 2, 2020) (per curiam), does not support injunctive relief. In that case, the Court made clear that it enjoined the executive order in question only insofar as it prevented the drive-in church services. *Id.* at 9; accord *On Fire Christian Center, Inc. v. Fischer*, No. 3:20-cv-264-JRW, 2020 WL 1820249 (W.D. Ky. April 11, 2020) (same). Governor Northam's Orders do not prohibit such activities.

requested relief would be increased transmission of a deadly disease for which there is currently no cure. Indeed, granting Lighthouse the relief it seeks—the ability to meet in gatherings of any size—could easily transform the very services to which people turn for comfort into the kind of "hothouses for the virus" that have "exacerbate[ed] outbreaks" across the country. Wilson et al., *supra* note 3. And, of course, the risk posed by large public gatherings is not confined to the worshipers who choose to participate. Oliver Decl. ¶ 6. Instead, the virus spreads rapidly throughout communities, and, as healthcare systems become overrun, patients and healthcare workers suffer. ¶¶ 8, 15, 20, 25.[31] In places like Accomack that are already under significant strain from existing outbreaks, the risk to the healthcare system is all the more severe.

*     *     *

As this Court has observed, "[i]t is no exaggeration to recognize that the stakes for residents of the Commonwealth are life-or death." Dkt. 16 at 32. For that reason and others, Lighthouse has not shown that it is entitled to the extraordinary relief it seek.

## CONCLUSION

The motion for an injunction pending appeal should be denied.

---

[31] For those reasons, it is difficult to fathom (much less calculate) the size of the bond that would be required to "secure" the "rights" to public health and safety that would be threatened were this Court to grant the requested injunction. Fed. R. Civ. P. 62(d).

Respectfully submitted,

**RALPH NORTHAM**

By:   */s/ Toby J. Heytens*
     Toby J. Heytens
     Counsel for Defendant

Mark R. Herring
   *Attorney General*

Erin B. Ashwell (VSB No. 79538)
   *Chief Deputy Attorney General*

Victoria N. Pearson (VSB No. 48648)
Samuel T. Towell (VSB No. 71512)
   *Deputy Attorneys General*

Jacqueline C. Hedblom (VSB No. 68234)
   *Assistant Attorney General*

Toby J. Heytens (VSB No. 90788)
   *Solicitor General*

Michelle S. Kallen (VSB No. 93286)
Martine E. Cicconi (VSB No. 94542)
   *Deputy Solicitors General*

Jessica Merry Samuels (VSB No. 89537)
   *Assistant Solicitor General*

Zachary R. Glubiak (VSB No. 93984)
   *John Marshall Fellow*

Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
(804) 786-7240 – Telephone
(804) 371-0200 – Facsimile
solicitorgeneral@oag.state.va.us

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2020, a true and accurate copy of this paper was filed

electronically with the Court's CM/ECF system, which will then send a notification of such

filing to the parties.

By:   */s/ Toby J. Heytens*
         Toby J. Heytens